**RT COMMUNICATIONS, INC.; TCT West, Inc.; and Union Telephone Company, Appellants (Petitioners),**

v.

**The STATE BOARD OF EQUALIZATION FOR the STATE OF WYOMING,**

and

**The Department of Revenue for the State of Wyoming,**

No. 99–319.

Supreme Court of Wyoming.

Sept. 29, 2000.

Rehearing Denied Oct. 26, 2000.

Representing Appellant: Bruce S. Asay of Associated Legal Group, LLC, Cheyenne.

Representing Appellee Department of Revenue: Gay Woodhouse, Attorney General; Rowena L. Heckert, Deputy Attorney General; and P. Olen Snider, Jr., Assistant Attorney General.

Before LEHMAN, C.J., and THOMAS, GOLDEN, HILL & KITE, JJ.

KITE, Justice.

Appellants RT Communications, Inc., TCT WEST, Inc.,[1] and Union Telephone Company (the Telephone Companies) filed a consolidated Petition for Review of a decision of the State Board of Equalization,[2] which affirmed the 1995 final determinations by Appellee Department of Revenue of the fair market value of the state-assessed industrial property of the three companies. The Telephone Companies argued that the values improperly included the value of intangible property exempted by statute and the Department of Revenue failed to adjust the values of TCT WEST and RT Communications for economic obsolescence. We affirm the State Board of Equalization's order and conclude the valuation of the Telephone Companies was consistent with applicable statutes and regulations.

**ISSUES**

The Telephone Companies present five issues for review:

*Issue One*: Was the inclusion of the "acquisition adjustment" in the department's valuation of the petitioners' property erroneous and contrary to statute?

*Issue Two*: Was the decision of the Board of Equalization which allowed an acquisition adjustment contrary to statutory interpretation[?]

*Issue Three*: Was the decision of the Board of Equalization supported by the record?

*Issue Four*: Was the Department's exclusive reliance on the purchase price erroneous?

*Issue Five*: Was the Department's failure to consider obsolescence erroneous?

The Department of Revenue counters with a statement setting out nine issues for consideration:

1. Is the unitary method of valuing telephone company property a rational valuation method?

2. Is the unitary valuation method the generally accepted appraisal standard of valuing telephone company property?

3. Was the Department of Revenue's use of the unitary valuation method arbitrary and capricious, an abuse of discretion or contrary to law?

4. Do acquisition adjustments, going-concern values and related intangibles differ materially from the "intangible personal property" exempted by the Legislature?

5. Does the Department of Revenue's use of the unitary valuation method result in the taxation of intangible personal property?

6. Would the disregard of the enhancing effect of going-concern value upon a telephone company's tangible property re-

---

1. TCT WEST and RT Communications are wholly owned subsidiaries of Tri County Telephone Association, Inc. and Range Telephone Cooperative, Inc. respectively. They were formed expressly for the purpose of owning and operating the exchanges acquired from U.S. WEST Communications, Inc.

2. Although the State Board of Equalization is listed as a party in the caption of this case, it properly did not file a brief or appear at oral arguments in accordance with our directives in *Antelope Valley Improvement v. State Board of Equalization for State of Wyoming*, 992 P.2d 563 (Wyo.1999), *clarified at* 4 P.3d 876 (Wyo.2000).

sult in an unconstitutional undervaluation of that tangible property?

7. Did the Department of Revenue's 1995 valuations of these telephone companies' properties account for obsolescence?

8. Has the Department of Revenue consistently applied the unitary valuation method to and among these telephone companies?

9. Was the State Board of Equalization's decision supported by substantial evidence?

## FACTS

In May 1994, the Telephone Companies executed letters of intent to purchase certain rural telephone exchanges located throughout the State of Wyoming from U.S. WEST Communications, Inc. They were aware at the time of the purchase that many of the assets and facilities were in poor condition and in need of immediate repair and/or replacement. At that time, the certificates of convenience and necessity were exclusive and unlimited in duration. Following a review by federal and state regulatory authorities, the transactions were approved, and on October 25, 1994, the exchanges were transferred to the Telephone Companies. The amounts paid for their respective exchanges were $17,000,000 by Union Telephone Company, $52,200,000 by RT Communications, and $15,400,000 by TCT WEST. Those costs were significantly higher than the "book value" of the exchanges. That difference is called the "acquisition adjustment," and it reflected the value of the purchases above and beyond the physical components of the exchanges. According to their annual reports, the acquisition adjustments for each company were: Union Telephone Company–$6,517,330; TCT WEST–$5,713,196; and RT Communications–$21,130,751. The acquisition adjustments associated with the exchanges purchased by the Telephone Companies lie at the heart of this dispute. Furthermore, as a condition of the sales, the Public Service Commission required the Telephone Companies to immediately replace certain facilities and equipment that were obsolete and upgrade the plant to provide enhanced telecommunications services.

In 1995, the Department of Revenue commenced its annual appraisal of the Telephone Companies. In January, it sent its annual reporting form for the telecommunications industry to the Telephone Companies. Based upon information provided by the Telephone Companies in the returned reports, the Department of Revenue valued the companies to determine their fair market value. The Department of Revenue's appraisals utilized the unitary valuation method, which values a company as a whole working unit rather than looking at each individual asset separately and simply adding the values. The Department of Revenue's regulations authorize the use of the market, cost, and income approaches to establishing unitary value. Because RT Communications and TCT WEST had existed for only a short period of time prior to the appraisal, the Department of Revenue could only use a historical cost approach to determine the fair market value of those utilities. Similarly, without a reliable estimate of future income, the Department of Revenue claimed it was unable to perform the calculations necessary to establish the amount of economic obsolescence associated with the exchanges purchased from U.S. WEST by TCT WEST and RT Communications. The result was valuations of $28,554,396 for Union Telephone Company, $13,803,651 for TCT WEST, and $52,640,000 for RT Communications.

The Telephone Companies filed objections to the final assessments of the Department of Revenue on the grounds that they improperly included tax-exempt property, the acquisition adjustments, and failed to account for the economic obsolescence of the systems purchased by TCT WEST and RT Communications. After a contested case hearing, the State Board of Equalization affirmed the assessments. It concluded that the Department of Revenue had properly accounted for the acquisition adjustments to the extent that they enhanced the value of the Telephone Companies' taxable, tangible personal property and that the refusal to account for the economic obsolescence of the exchanges was appropriate given the absence of information necessary to make the calculations. The Telephone Companies appealed from that de-

cision to the district court, which has certified the matter to us.

## STANDARD OF REVIEW

Wyo. Stat. Ann. § 16-3-114(c) (LEXIS 1999) delineates the scope of appellate review for agency decisions:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

When faced with contested issues of fact, we examine the entire record to determine if the agency's findings are supported by substantial evidence. *Laramie County Board of Equalization v. Wyoming State Board of Equalization*, 915 P.2d 1184, 1189 (Wyo. 1996). If they are, we do not substitute our judgment for that of the agency and will uphold the factual findings on appeal. *Id.* Substantial evidence is more than a scintilla of evidence; it is evidence that a reasonable mind might accept in support of the conclusions of the agency. *Id.* Borrowing from the

Third Circuit Court of Appeals, we have articulated the difference between findings of basic fact and ultimate fact as follows:

"Basic facts are the historical and narrative events elicited from the evidence presented at trial, admitted by stipulation, or not denied, where required, in responsive pleadings. Inferred factual conclusions are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the basic facts. No legal precept is implicated in drawing permissible factual inferences. But an inferred fact must be distinguished from a concept described in a term of art as an 'ultimate fact.' So conceived, an ultimate fact is a mixture of fact and legal precept...."

*Union Pacific Railroad Company v. Wyoming State Board of Equalization*, 802 P.2d 856, 860 (Wyo.1990) (quoting *Universal Minerals, Inc. v. C.A. Hughes & Company*, 669 F.2d 98, 102 (3rd Cir.1981) (citations omitted)).

If a conclusion of law is in accord with the law, it is affirmed. *Id.* We consider three distinct possibilities when reviewing agency determinations on questions of law. *Id.* If the agency correctly applied its findings of fact to the correct rule of law, the agency's conclusions are affirmed. *Id.* However, if the agency applied its findings of fact to the wrong rule of law or if the agency incorrectly applied its findings of fact to the correct rule of law, we correct the error. *Id.*

When an agency's determinations contain elements of law and fact, we do not treat them with the deference we reserve for findings of basic fact. *Id.* When reviewing an "ultimate fact," we separate the factual and legal aspects of the finding to determine whether the correct rule of law was properly applied to the facts. 802 P.2d at 860-61. We do not defer to the agency's ultimate factual finding if there was an error in either stating or applying the law. 802 P.2d at 861.

Parties claiming an improper valuation shoulder the burden of proof when challenging the assessor's valuation of their property. *Gray v. Wyoming State Board of*

*Equalization,* 896 P.2d 1347, 1350–51 (Wyo. 1995).

We have said it is not the duty of this court

"to determine which of various appraisal methods is best or most accurately estimates FMV [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [particular] method of appraisal, and, if so, whether substantial evidence exists to support the manner in which it was used."

*Holly Sugar Corp. v. State Bd. of Equalization,* 839 P.2d 959, 963 (Wyo.1992).

896 P.2d at 1351. The Department of Revenue is vested by law with the duty of establishing and implementing a system to establish the fair market value of all property valued for taxation. Wyo. Stat. Ann. §§ 39-1-101(a)(vi), -301 (Michie 1997) (repealed 1998).[3] The purchase price of property, although evidence of its fair market value, is not conclusive. *Gray,* 896 P.2d at 1352–53.

## DISCUSSION

The Telephone Companies contend that the acquisition adjustments were a reflection of the value of certain intangible assets including franchise and service rights and goodwill or the value of the property purchased as part of a "going concern." The Telephone Companies argue that, as intangible personal property, the acquisition adjustments were exempted from taxation pursuant to Wyo. Stat. Ann. § 39-1-201(a)(xxix) (Michie 1997) (repealed 1998).[4] What constituted intangible personal property was defined at Wyo. Stat. § 39-1-101(a)(vii) (Michie 1997) (repealed 1998),[5] which provided:

(vii) "Intangible personal property" includes:

(A) Money and cash on hand including currency, gold, silver and other coin, bank drafts, certified checks and cashier's checks;

(B) Money on deposit;

(C) Accounts receivable and other credits;

(D) Bonds, promissory notes, debentures and other evidence of debt;

(E) Shares of stock or other written evidence of ownership;

(F) Judgments for the payment of money;

(G) Annuities and annuity contracts.

The Telephone Companies assert that the use of the word "includes" indicated the definition of "intangible personal property" was not one of limitation but rather was a nonexclusive list of specific examples. Based on definitions of "intangible property" as a thing that was not "tangible or corporeal," the Telephone Companies argue that the acquisition adjustments were intangible property. Therefore, because Wyoming law exempted intangible property from taxation, the Telephone Companies contend that the intangible value of that property must be deducted from the unitary value of their tangible property.

Although the Department of Revenue agrees that § 39-1-101(a)(vii) did not present an all-inclusive list of intangible personal property, it contends that the acquisition adjustments were not intangible personal property. The Department of Revenue argues that the items listed as intangible personal property in the statute shared three characteristics: (1) they were items that had no inherent worth but were representative of an underlying right or duty that had appreciable value; (2) they had a physical existence as a proxy for the underlying right or duty; and (3) they were properties that could be separately transferred and freely alienable. The acquisition adjustments had none of these three characteristics and, therefore, should

---

**3.** All references, unless otherwise indicated, are to the statutes in effect at the time of the subject assessments: § 39-1-101(a)(vi) was repealed and recodified at § 39-11-101(a)(vi), and § 39-1-301 was repealed and recodified at § 39-11-102(b). 1998 Wyo. Sess. Laws ch. 5, § 1.

**4.** Repealed and recodified at § 39-11-105(a)(xxix). 1998 Wyo. Sess. Laws ch. 5, § 1.

**5.** Repealed and recodified at § 39-11-101(a)(vii)(A–G). 1998 Wyo. Sess. Laws ch. 5, § 1.

not be considered intangible personal property under § 39–1–101(a)(vii).

▉ As a preliminary matter, we note that the State Board of Equalization made the following decision regarding § 39–1–101(a)(vii):

> The Board holds the Department is incorrect in its interpretation of *Wyo. Stat. § 39–1–101(a)(vii)* that the list of intangibles is all inclusive. To the contrary, the word "includes" is ordinarily a term of enlargement and not one of limitations. *Schwab v. Ariyoshi*, [58 Haw. 25,] 564 P.2d 135, 141 (Hawaii 1977); [*s*]*ee also 2 A N Singer, Sutherland Statutory Construction, Section 47.07 (Sands 4*[th]* ed.1984).* Because the ordinary and usual sense of the word "includes" is not one of limitations, we are bound to interpret "includes" as set out heretofore and not as argued by the Department. *Wyo. Stat. § 8–1–103(a)(i).*

Furthermore, the State Board of Equalization's decision specifically treated the acquisition adjustments as intangible personal property. Thus, this Court finds itself in the odd position where the appealing party's position on appeal is the same as the State Board of Equalization's decision below. Conversely, the appellee–the Department of Revenue–did not perfect an appeal on any aspect of the State Board of Equalization's decision. Ultimately then, a party adversely affected by the State Board of Equalization's decision did not perfect an appeal on the issues of whether § 39–1–101(a)(vii) was an all-inclusive definition of intangible personal property and whether the acquisition adjustments were that type of property. Ordinarily, for purposes of this appeal, we would assume that the acquisition adjustments were intangible personal property as defined by § 39–1–101(a)(vii) based on the concept of the law of the case. There is a high likelihood that this issue will arise again in the context of subsequent annual assessments of the Telephone Companies. Therefore, we will address the merits of the issue.

▉ We have often repeated our rules for interpreting statutory language:

> Our rules relating to the interpretation of statutes demand that we abide by the plain meaning of the statute if its language is clear and unambiguous. The statute will be construed as a whole with the ordinary and obvious meaning applied to words as they are arranged in paragraphs, sentences, clauses and phrases to express the intent of the legislature. In analyzing the clarity or ambiguity of the statute, we turn to the guidance of grammarians.

*Peterson v. Wyoming Game and Fish Commission*, 989 P.2d 113, 117 (Wyo.1999) (citations omitted).

▉ As noted above, the State Board of Equalization held that the word "includes," as used in § 39–1–101(a)(vii), was a term of enlargement and not one of limitation. This holding was correct because, as we noted in a recent decision, the use of the word "includes" in a statutory context has specific implications: "The use of the word 'includes' is significant because 'includes' generally signifies an intent to enlarge a statute's application, rather than limit it, and it implies the conclusion that there are other items includable, though not specifically enumerated." *Board of County Commissioners of Teton County v. Bassett*, 8 P.3d 1079 at 1083 (Wyo.,2000). Thus, § 39–1–101(a)(vii) provided a definition of the term "intangible personal property" through a nonexclusive list of examples.

▉ Of course, the obvious shortfall of that method of defining a term arises when the status of certain property is at issue that was not included within the nonexclusive roster set forth in the statute. That difficulty comes into play when we consider whether or not the acquisition adjustments were intangible personal property. The one common characteristic of each of the items listed within § 39–1–101(a)(vii) was that they had no inherent value in and of themselves but instead represented value. In the ordinary sense of usage, this is what "intangible property" means: "As used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." Black's Law Dictionary 809 (6th ed.1990).

This definition is clearly what was intended by the legislature as evidenced by the fact that § 39–1–101(a)(vii) specifically listed some of the examples cited therein such as stocks, bonds, and promissory notes. Within that context, the acquisition adjustments were clearly intangible property. The acquisition adjustments did not reflect real or physical property that had value intrinsic to it; rather, the value reflected by the acquisition adjustments related to values associated with the business of the utilities such as goodwill, the certificate of convenience, and franchise rights. We conclude, therefore, that the State Board of Equalization was correct in treating the acquisition adjustments as intangible personal property pursuant to § 39–1–101(a)(vii).

■ We turn now to the methodology employed by the Department of Revenue in its assessments of the Telephone Companies. In reviewing property tax assessments, "this court has consistently interpreted Wyo. Const. art. 15, § 11 [6] to require 'only a rational method [of appraisal], equally applied to all property, which results in essential fairness.' " *Holly Sugar Corporation v. State Board of Equalization*, 839 P.2d 959, 964 (Wyo.1992) (quoting *Teton Valley Ranch v. State Board of Equalization*, 735 P.2d 107, 115 (Wyo.1987)).

■ The Department of Revenue assesses public utilities on a statewide basis. This centralized approach to assessment of utility property was historically designed by the states because a local assessor could not effectively reach and tax railroad companies' large intangible values. James A. Amdur,

*Property Taxation of Regulated Industries,* 40 Tax Law. 339 (1987).

Regulated industry property commonly is valued under the "unitary" method. The enterprise first is valued as a whole as a going concern; a portion of that value is then allocated by formula to the property in the taxing jurisdiction. The theory is that the property "forms a part of an organic system and may be assessed in terms of the economic contribution which each component makes to the entire system." To the extent that the total system value exceeds the aggregate physical value of the individual tangible assets, the appraisal includes the company's intangibles, principally "going concern value," which is the "value added by the property's assemblage into a going business," and the "franchise," which is the authority of the company to operate in a certain area.

*Id.,* at 343–44. Thus, the unitary method values a company as a whole and may utilize intangible property in a valuation to the degree that intangible property enhances the value of tangible property. *Beaver County v. WilTel, Inc.,* 995 P.2d 602, 610–11 (Utah 2000); James A. Amdur, *Telecommunications Property Taxation,* 46 Fed. Comm. L.J. 219, 228 (1994) ("Although the intangible property may not be taxed *directly,* it may 'enhance' the value of the tangible property in the unit and may be taxed *indirectly* as part of such enhanced value"). This use of intangible property to assess the value of tangible property is justified on two grounds. First, intangible property can affect the val-

6. Article 15, Section 11 of the Wyoming Constitution provides:

(a) All property, except as in this constitution otherwise provided, shall be uniformly valued at its full value as defined by the legislature, in three (3) classes as follows:

(i) Gross production of minerals and mine products in lieu of taxes on the land where produced;

(ii) Property used for industrial purposes as defined by the legislature; and

(iii) All other property, real and personal.

(b) The legislature shall prescribe the percentage of value which shall be assessed within each designated class. All taxable property shall be valued at its full value as defined by the legislature except agricultural and grazing lands which shall be valued according to the capability of the land to produce agricultural products under normal conditions. The percentage of value prescribed for industrial property shall not be more than forty percent (40%) higher nor more than four (4) percentage points more than the percentage prescribed for property other than minerals.

(c) The legislature shall not create new classes or subclasses or authorize any property to be assessed at a rate other than the rates set for authorized classes.

(d) All taxation shall be equal and uniform within each class of property. The legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal.

ue of tangible property. As one commentator explained:

> Trying to separate intangible rights from tangible value is comparable to trying to separate the tangible value of the bricks and mortar of your house from the intangible rights found in your deed and building and occupancy permits to use and occupy the house. In other words, if you do not have the intangible legal right to live in your house and evict others from the premises, what possible value can the house have to you?

Robert W. Lambert, *Cellular Telephone Companies: Property Tax Litigation in California,* J. Prop. Tax Mgmt. 15, 16 (1991). This leads to the second ground: the difficulty of separating intangible property from tangible property.

The value of intangible assets is manifested in their ability to generate profits for the enterprise in excess of those necessary to provide a fair return on the value of the tangible assets and working capital of the business. Some intangible assets have value in their own right, such as franchises, patents, licenses, copyrights and the like. However, many of the intangible assets of a business enterprise derive their value from being a part of the business and thus cannot be severed and sold separately. Some of these types of intangibles include a trained and assembled work force, management systems, customer base, and elements of "going-concern" value.

Michael E. Green & Terrence J. Benshoof, *Exclusion of Intangibles From The Unit Value,* 1 St. Tax Notes 547, 548–49 (1991). The Telephone Companies themselves made no attempt to allocate specific amounts to the values of the certificates of convenience and necessity, rights of way, or other intangible items of value that they contended were obtained when the property was purchased. Yet, the Telephone Companies conceded in their reply brief by reliance on certain authorities and in argument by counsel that some portion of the acquisition adjustments could represent enhanced value of the taxable property. None of the tangible property such as telephone poles, lines, and switching equipment had any value unless it could be used, and it could not be used without a certificate of convenience and necessity and these other intangible items that the Telephone Companies argued were accounted for in the acquisition adjustments. If the Telephone Companies could not, or would not, allocate separate values to these intangible assets, they cannot reasonably argue that the Department of Revenue could have or should have done so.

The rationale for allowing taxation of the enhanced value imparted by intangible property is grounded in the concept of valuing a company as a "going concern" or unit, which is to ensure that the entire real value of a company's property is considered. As the court in *ITT World Communications, Inc. v. City and County of San Francisco,* 37 Cal.3d 859, 210 Cal.Rptr. 226, 693 P.2d 811, 815 (1985), noted:

> One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property.... It has long been recognized that "public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole." (Bertane, [*The Assessment of*] *Public Utility Property* [*in California* (1973) 20 UCLA L.Rev. 419] ... 433.) Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty).

*See also* Amdur, *Telecommunications Property Taxation, supra,* at 228. The unitary method is considered the most rational means of central assessment to determine the value of an enterprise whose functions

rely on cross-boundary connections. *Beaver County,* 995 P.2d at 607.

The Department of Revenue's regulations provide, and have provided for a number of years, for the use of the unitary method for valuing public utilities in Wyoming. *See* Department of Revenue Regular Rules ch. 7, *Ad Valorem Valuation Methodology and Assessment (State Assessments)* (1996). The Department of Revenue has, in fact, employed the unitary method since at least 1988 to all public utility valuations. As shown by the foregoing authorities, the unitary method is a rational method of appraisal and, when equally applied to all property, results in essential fairness. Although intangible personal property is exempt from taxation, it may add value to taxable, tangible property, and to that extent, it should be included in any assessment in order to properly reflect the true value of the property. Wyo. Const. art. 15, § 11. In utilizing the unitary method, however, to the extent that intangible property has value beyond any enhancing effect on tangible property and is separable from those assets, it must be excluded. *GTE Sprint Communications Corporation v. County of Alameda,* 26 Cal. App.4th 992, 32 Cal.Rptr.2d 882, 891 (1994); § 39–1–201(a)(xxix).

The question we now address is whether the Department of Revenue properly accounted for the acquisition adjustments in its assessment of the Telephone Companies. In other words, we must determine whether substantial evidence supported the Department of Revenue's valuations. The State Board of Equalization made the following findings:

51. These Board decisions clearly hold "(w)hile intangible property is exempt from property taxation, such property may enhance the value of taxable tangible property and this may be reflected in the valuation of the tangible property." Quoting, *ITT World Communication,* [Inc. v. County of Santa Clara 101 Cal.App.3d 246,] 162 Cal.Rptr. 186, 190 (1980). "Intangible property is considered in determining the market value of the company as a whole because it bears on the company's value as a going concern." Quoting, *Mich. Wis.*

*Pipeline Co. v. Iowa St. Bd. Of Rev.,* 368 N.W.2d 187, 192 (Iowa 1985).

52. Going-concern value includes an intangible enhancement of value that assimilates the effect of all the operating property interacting together. The unit valuation concept involves determining a going-concern value which may include contributions due to intangible property, but only to the extent such intangible property is necessary to the operation of the property being assessed. Clearly the certificate of convenience issued by the Public Service Commission and the going-concern or customer base was necessary for the operation of all three Petitioners.

. . . .

54. Wyoming may attempt to tax the intangible "going-concern" value, as well as the value of the tangible assets within the state. *Northwest Natural Gas. Co. v. Clark County,* [98 Wash.2d 739,] 658 P.2d 669, 673 (Wash.1983). Other states allow the enhancement of value of tangible personal property by considering the intangibles. *U.S. Transmission Sys. v. Bd. Of Assessment,* 715 P.2d 1249, 1256 (Colo. 1986). "Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole ..." *ITT World Communications v. San Francisco,* [37 Cal.3d 859, 210 Cal.Rptr. 226,] 693 P.2d 811, 815 (Cal.1985).

55. This Board does not find the Department's treatment of the intangibles, including but not limited to the "acquisition adjustment[,"] amounted to a direct taxation of intangibles. Rather, the Board finds the Department merely considered and weighed the intangibles when deriving its value for tax purposes by relying on the value of the company using the unitary approach. In particular, the Department's rules on historical cost merely direct "acquisition costs" etc. be considered. Although the Department's appraiser, Mr. Cordingly, testified erroneously as to what property was taxable in terms of intangibles and tangibles, the testimony as a whole indicates intangibles were merely

considered by the Department in enhancing the value of Petitioners' properties.

The focus of the Telephone Companies' arguments is on the use of the acquisition adjustments for any valuation purpose under any circumstances. Having held that it was proper for the Department of Revenue to consider the acquisition adjustments, the question becomes whether substantial evidence existed to support the Department of Revenue's consideration of that factor within the context of the unitary methodology. The Telephone Companies, who bear the burden as the challenger of the valuation, simply claim that there was no evidence to support the State Board of Equalization's decision delineated above. They fail, however, to cite to any part of the record supporting that contention or to explain why the State Board of Equalization's decision was incorrect beyond bald statements that it was so. Our review of the record leads us to conclude that the evidence supported the State Board of Equalization's decision. The principal appraiser for the state assessed property section testified that the appraisals complied in all respects with the Department of Revenue's rules and the acquisition adjustments were considered for the value they added to the Telephone Companies. This testimony, coupled with the exhibits detailing the assessment process, was sufficient to constitute substantial evidence in the absence of any reference to evidence by the Telephone Companies demonstrating misallocation of the acquisition adjustment.

■ The Telephone Companies also argue that the Department of Revenue's appraisal essentially valued the property at the purchase price and caused an immediate and unreasonable increase in taxable value. They incorrectly contend that *Gray*, 896 P.2d 1347, prohibits that result. This Court held in that case that purchase price could not be relied upon as the sole measure of value, but could properly be considered as part of the analysis. Certainly, the telecommunications industry is experiencing dramatic changes. The mere fact that the Telephone Companies were willing to pay the purchase price reflected by the net book value plus the acquisition adjustment was evidence of what they

believed the property was worth. Their experts testified they were willing to pay significantly more for the property than net book value for several reasons. First, the sale was the result of a "competitive bidding process which established at that time the market value of the exchanges over and above the net book value." Second, the Telephone Companies were paying for the right to make future investments in this property for which they would have the exclusive right to operate. Third, these were ongoing operations which would have immediate cash flow. Further, because these were regulated utilities with a guaranteed rate of return, future revenues could be predicted with accuracy. Consequently, as the Telephone Companies' expert testified:

> [I]t is almost advantageous for a small company to buy property that is antiquated and that they're going to replace because ... they're going to have the ability to invest in the future and earn an authorized return on that investment.... There was pent-up demand in every one of those exchanges. There were services customers wanted that they couldn't get. And by investing in the infrastructure, we knew we'd have substantial customer growth that U.S. West didn't see. We'd have increased demand for services.

In addition, the Telephone Companies saw possibilities for future income that was not regulated by the Public Service Commission. The Telephone Companies knew from the outset that they would not be allowed to earn a rate of return on the difference between net book value and the purchase price, the acquisition adjustment. Both the Public Service Commission order approving the sales and the U.S. WEST purchase contract prohibited it. Yet, the Telephone Companies' projections of the income they would be able to earn still justified the purchase price including the acquisition adjustment. In light of the Telephone Companies' own testimony, their position on appeal that the purchase price does not reflect the value of the property rings hollow.

### Economic Obsolescence

■ RT Communications and TCT WEST complain that their valuations were

not adjusted for economic obsolescence. Their argument in their main brief is presented below in its entirety:

An assessor must use a method of valuation appropriate to the property being assessed. The failure of an assessor to account for functional or economic obsolescence affecting the salability of the property constitutes an abuse of discretion. Wyoming State Board of Equalization Docket No. 93–162, cited in Wyoming State Board of Equalization Quarterly Review, vol. 1, no. 1, at 2–3; *see also, First City Corp. v. City of Lansing,* [153 Mich. App. 106,] 395 N.W.2d 26 (Mich.Ct.App. 1986).

In the instant case, the Department made an adjustment for Union's obsolescence and yet failed to account for the acknowledged obsolescence suffered by TCT WEST and RT Communications. The assessments were accordingly defective and must be revised consistent with the Petitioners' testimony.

This is simply not a cogent argument. This is nothing more than generalized statements without support by argument, record support, and citation to authority. The Telephone Companies do present a more detailed argument complete with aspects lacking in their main brief, but inexplicably they choose to present it in their reply brief. The purpose of a reply brief is to allow the appellants the opportunity to address issues and arguments raised by the appellees. *Idaho Migrant Council, Inc. v. Warila,* 890 P.2d 39, 42 (Wyo.1995); W.R.A.P. 7.03. The reply brief fails to conform to our rules. The Telephone Companies have failed to present a cogent argument on this issue, and ordinarily we would not address it. *Basolo v. Gose,* 994 P.2d 968, 970 (Wyo.2000). However, given the possibility of this situation arising again in the future, we will briefly address the substance of the Telephone Companies' argument.

■ RT Communications and TCT WEST note that an adjustment for economic obsolescence was made for Union Telephone Company, but despite the availability of the same financial information for RT Communications and TCT WEST, a similar adjustment was not made for them. The Department of Revenue responds that an economic obsolescence analysis was not possible because those companies had only a few months of operating experience and, therefore, a limited income history. An economic obsolescence analysis depends on capitalization of the income expected from the property with a comparison of that rate of return to the approved industry rate of return, the difference constituting the percentage of economic obsolescence deducted from the total valuation. Without a reliable estimate of future income, the Department of Revenue contends the analysis would not be reasonable. The Telephone Companies' appraiser did such an analysis using income he estimated the Public Service Commission would allow. However, that estimate of future income would not have included all of the income that the Telephone Companies had projected when they did their analysis of what price they could justify paying for the property. In addition, a Department of Revenue witness testified that, during the valuation process, an information request sent to the Telephone Companies specifically asked for any claims for economic obsolescence and supporting documentation and none of the Telephone Companies responded to that request. However at the hearing, the Telephone Companies provided their own analysis and suggested that the Department of Revenue could have used income history from U.S. WEST.

Quite simply, the Department of Revenue lacked the requisite information to make the necessary, reliable calculations to establish an economic obsolescence adjustment. The Department of Revenue specifically requested information relevant to an economic obsolescence analysis, but the Telephone Companies failed to provide any information at all. Clearly, the Telephone Companies possessed such information because they were able to provide their own analysis at the hearing. The Telephone Companies are ill positioned now to complain that the Department of Revenue failed to perform an analysis when they failed to provide the necessary information.

■ Further, the Telephone Companies argue that certain changes in the federal and

state statutes after the sale reduced the value of the property and were not considered by the Department of Revenue. In 1995, the Wyoming legislature enacted the Wyoming Telecommunications Act of 1995 which made a number of changes in the regulation of this industry including limiting the life of certificates of convenience and necessity to ten years. Further deregulation was accomplished by the Federal Telecommunications Act of 1996, Public Law No. 104–104, 11 Stat. 56 (1996). The Telephone Companies testified that those statutory changes caused their property to be worth less and they would not have paid the same purchase price had those statutes been in effect at the time of the sale. However, they provided no specific information about the amount of devaluation allegedly caused by the new regulatory scheme. Any attempt by the Department of Revenue to quantify the alleged devaluation with no supporting evidence would have been improper.

The Department of Revenue did not act arbitrarily or capriciously in rejecting an economic obsolescence analysis based on insufficient data.

### CONCLUSION

The unitary method is a rational means of determining the fair market value of a public utility. Intangible personal property, although generally exempt from taxation, may be considered in valuing utility property to the extent that the property enhances the value of taxable, tangible property. This is an appropriate methodology to determine the fair market value of utility property. However, the Department of Revenue shall, to the extent possible, remove the value of intangible personal property that is separable and identifiable.

The Department of Revenue's assessment of the Telephone Companies for the 1995 tax year was supported by substantial evidence, and accordingly the State Board of Equalization's decision is affirmed.