2007 WY 79

**CHEVRON U.S.A., INC., Appellant (Petitioner),**

v.

**DEPARTMENT OF REVENUE, State of Wyoming, Appellee (Respondent).**

No. 06–56.

Supreme Court of Wyoming.

May 11, 2007.

Representing Appellant: William J. Thomson II, Randall B. Reed, and Brian J. Hanify of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming. Argument by Mr. Thomson.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; and Cathleen D. Parker, Senior Assistant Attorney General. Argument by Ms. Parker.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] The Department of Revenue used the comparable value method set forth in Wyo. Stat. Ann. § 39–14–203(b)(vi)(B) to establish the value of natural gas produced by Chevron and processed at its Carter Creek processing plant in 2000 and 2001. Chevron claims that there were no comparable agreements for use in determining an appropriate processing fee and, consequently, the DOR's choice and application of the comparable value method was flawed. We conclude that the State Board of Equalization properly ruled: (1) The Department of Revenue (DOR) had a reasonable basis for choosing the comparable value method to appraise Chevron's Carter Creek production; and (2) the DOR appro-

priately applied the comparable value method to determine the fair market value of Chevron's production in 2000 and 2001. Consequently, we affirm.

### ISSUES

[¶ 2] Chevron phrases the issues as:

1. Do comparable processing agreements exist for Chevron's Carter Creek plant that satisfy the statutory elements of Wyo. Stat. Ann. § 39–14–203(b)(vi)(B)?

2. Does the selection of the comparable value method, Wyo. Stat. Ann. § 39–14–203(b)(vi)(B) fail to determine the fair market value for Chevron's Carter Creek production at the "point of valuation?"

3. Was Chevron denied its right to equal and uniform tax treatment in violation [of the] Wyoming Constitution because the Department allowed other similarly-situated taxpayers to use the proportionate profits methodology which yielded a far lower taxable value for those other taxpayers?

[¶ 3] The DOR's statement of the issues is more detailed:

I. Did the State Board of Equalization correctly affirm the Department of Revenue's selection of the comparable value method as the method which most accurately reflected the taxable fair market value of [Chevron's] 2000–02 Carter Creek production?

II. Did the State Board of Equalization correctly affirm the Department of Revenue's application of a comparable value processing fee of 25% of the product paid in-kind, the maximum fee paid by any producer regardless of any circumstances to value [Chevron's] 2000 and 2001 Carter Creek production?

III. Did the State Board correctly determine that [Chevron] failed to carry its burden of proof when it failed to offer any evidence that its application of proportionate profits reflected the most accurate fair market value for taxation purposes, as required by Wyo. Stat. § 39–14–203(b)(viii)?

IV. Did the State Board of Equalization correctly affirm the Department's rejection of [Chevron's] application of proportionate profits which resulted in processing deductions far in excess of the actual costs to process and which bore no relationship to actual processing costs?

V. Did the State Board of Equalization correctly determine that [Chevron's] due process rights were not violated?

### FACTS

[¶ 4] Chevron owns natural gas production rights in the Carter Creek field which is located in Uinta and Lincoln counties. The field produces "sour gas," which has high levels of hydrogen sulfide. In order to process the sour gas from the Carter Creek field, Chevron constructed the Carter Creek Gas Processing Plant. Chevron is the sole owner of the Carter Creek plant. Consequently, there is no Construction and Operating Agreement for the Carter Creek plant, and Chevron does not charge itself a fee to process its Carter Creek field gas.

[¶ 5] In 1999, the DOR sent a letter to all Wyoming oil and gas producers directing them to use the comparable value method set out in § 39–14–203(b)(vi)(B), to value their production for 2000, 2001, and 2002, when it was sold beyond the point of valuation. Chevron sent an "exception letter" to the DOR, claiming that there were no comparable agreements for use in appraising its Carter Creek production under the comparable value method and requesting to utilize the proportionate profits valuation method instead. The DOR identified agreements it considered comparable and refused to allow Chevron to use its chosen appraisal method.

[¶ 6] Chevron disregarded the DOR's directive and reported the value of its production pursuant to the proportionate profits method. The DOR issued a notice of valuation for Chevron's Carter Creek natural gas production for 2000 using the comparable value method. The DOR used a 25% processing fee deduction and assigned a much larger taxable value to Chevron's production than Chevron had reported. Chevron ap-

pealed both the DOR's choice of valuation method and its notice of valuation for 2000 to the State Board of Equalization (SBOE), and the SBOE consolidated the appeals. After a contested case hearing, the SBOE upheld the DOR's choice of the comparable value method to appraise Chevron's Carter Creek natural gas production and its valuation of the gas for production year 2000.[1]

[¶ 7] The DOR also used the comparable value method and the 25% processing fee deduction to value Chevron's production for the Carter Creek field in 2001. Chevron objected to DOR's notice of valuation and appealed to the SBOE. The SBOE held another contested case hearing and upheld the DOR's valuation of Chevron's 2001 Carter Creek production. Chevron filed petitions for review of the SBOE decisions in the district court. The district court consolidated the appeals and certified them to this Court.

## STANDARD OF REVIEW

 [¶ 8] The district court certified this case to us pursuant to W.R.A.P. 12.09(b); consequently, we apply the appellate standards applicable to the court of the first instance. *State ex rel. Wyo. Dep't of Revenue v. Buggy Bath Unlimited, Inc.,* 2001 WY 27, ¶ 5, 18 P.3d 1182, 1185 (Wyo.2001); *see also Union Tel. Co. v. Wyo. Pub. Serv. Comm'n,* 907 P.2d 340, 341–42 (Wyo.1995). Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005) governs judicial review of administrative decisions.

 [¶ 9] When an appellant challenges an agency's findings of fact and both parties submitted evidence at the contested case hearing, we examine the entire record to determine if the agency's findings are supported by substantial evidence. *Colorado Interstate Gas Co. v. Wyoming Department of Revenue,* 2001 WY 34, ¶ 8, 20 P.3d 528, 530 (Wyo.2001); *RT Commc'ns, Inc. v. State Bd.*

*of Equalization,* 11 P.3d 915, 920 (Wyo.2000). If the agency's findings of fact are supported by substantial evidence, we will not substitute our judgment for that of the agency and will uphold the factual findings on appeal. "Substantial evidence is more than a scintilla of evidence; it is evidence that a reasonable mind might accept in support of the conclusions of the agency." *Id.*

 [¶ 10] This Court reviews an agency's conclusions of law *de novo. Wyo. Dep't of Revenue v. Guthrie,* 2005 WY 79, ¶ 13, 115 P.3d 1086, 1091 (Wyo.2005). If a conclusion of law is in accord with the law, it is affirmed. *Airtouch Commc'ns, Inc. v. Dep't of Revenue,* 2003 WY 114, ¶ 10, 76 P.3d 342, 347. "However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error." *Id. See also, Powder River Coal Co. v. Wyo. State Bd. of Equalization,* 2002 WY 5, ¶ 6, 38 P.3d 423, 426 (Wyo.2002); *Chevron U.S.A., Inc. v. State,* 918 P.2d 980, 983 (Wyo. 1996).

> When an agency's determinations contain elements of law and fact, we do not treat them with the deference we reserve for findings of basic fact. When reviewing an "ultimate fact," we separate the factual and legal aspects of the finding to determine whether the correct rule of law has been properly applied to the facts. We do not defer to the agency's ultimate factual finding if there is an error in either stating or applying the law.

*Basin Elec. Power Co-op., Inc. v. Dep't of Revenue, State of Wyo.,* 970 P.2d 841, 850–51 (Wyo.1998) (citations omitted). *See also Colorado Interstate Gas,* ¶ 8, 20 P.3d at 530–31.

## DISCUSSION

### 1. *Comparable Value*

[¶ 11] This case originated with the DOR's choice of the comparable value method, pursuant to § 39–14–203(b)(vi)(B), to de-

---

1. The SBOE allowed the Uinta County Board of County Commissioners to intervene in the action. Chevron requests that, in the event this case is remanded to the SBOE, we rule Uinta County should not be allowed to participate. We addressed this issue in *BP America Production Co. v. Department of Revenue,* 2005 WY 60, ¶ 14, 112

P.3d 596, 603–04 (Wyo.2005), and concluded that Uinta County's intervention was improper. The *BP* ruling controls the intervention issue in this case; however, because we affirm the SBOE's decision on the merits, the Board's error in allowing Uinta County to intervene has no bearing on the outcome of this case.

termine the value of Chevron's natural gas production for severance tax purposes. The severance tax for natural gas is calculated from the "value of the gross product," which is defined as the fair market value of the product less any deductions and exemptions allowed by Wyoming law. Wyo. Stat. Ann. §§ 39–14–201(a)(xxix) and 39–14–203(a)(i) (LexisNexis 2005). Wyo. Stat. Ann. § 39–14–203(b)(ii) (LexisNexis 2005) states: "The fair market value for ... natural gas shall be determined after the production process is completed.... [Thus,] expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral." Wyo. Stat. Ann. § 39–14–203(b)(iv) (LexisNexis 2005) defines when production of natural gas is considered complete: "The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator."

[¶ 12] Chevron's Carter Creek gas is sold after processing. Consequently, use of a valuation formula is necessary because Chevron's gas is not sold at the point of valuation. Section 39–14–203(b)(vi) describes the options for valuing natural gas sold after it has undergone processing.

§ 39–14–203. Imposition.

. . . .

(vi) In the event the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection is not sold at or prior to the point of valuation by bona fide arms-length sale, or, except as otherwise provided, if the production is used without sale, the department shall identify the method it intends to apply under this paragraph to determine the fair market value and notify the taxpayer of that method on or before September 1 of the year preceding the year for which the method shall be employed. The department shall determine the fair market value by application of one (1) of the following methods:

(A) Comparable sales-The fair market value is the representative arms-length market price for minerals of like quality and quantity used or sold at the point of valuation provided in paragraphs (iii) and (iv) of this subsection taking into consideration the location, terms and conditions under which the minerals are being used or sold;

(B) Comparable value-The fair market value is the arms-length sales price less processing and transportation fees charged to other parties for minerals of like quantity, taking into consideration the quality, terms and conditions under which the minerals are being processed or transported;

(C) Netback—The fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees. The netback method shall not be utilized in determining the taxable value of natural gas which is processed by the producer of the natural gas;

(D) Proportionate profits—The fair market value is:

(I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

(II) Nonexempt royalties and production taxes.

[¶ 13] The DOR and Chevron agreed that neither the comparable sales method, under subsection (A), nor the netback valuation method, set forth in subsection (C), was appropriate to value Chevron's Carter Creek production. Chevron advocated for application of the proportionate profits method under subsection (D), while the DOR employed the comparable value method set out in subsection (B). Using the comparable value method, the DOR must subtract the value of processing and transportation from the actual sales price to determine the fair market value of the gas at the point of valuation. *See BP America Co. v. Department of Revenue*, 2005 WY 60, ¶ 6, 112 P.3d 596, 600–01 (Wyo. 2005). In this case, the parties' disagreement in applying the comparable value method is focused on determining an appropriate

deduction for the processing fee and transportation apparently is not at issue.

[¶ 14] Chevron argues that, in order to decide this case, we must interpret the statutory term "comparable." It advocates defining "comparable" as "substantially equal" or "equivalent," consistent with our interpretation of that term in the context of a worker's compensation statute allowing an employee permanent partial disability benefits if he was unable to return to work at a "comparable" or higher wage after a work-related injury. *See Adams v. State ex rel. Wyoming Workers' Safety and Compensation Division*, 975 P.2d 17 (Wyo.1999). Thus, Chevron's argument continues: "Any comparable processing fee for Chevron's Carter Creek production must be based on quality, quantity, and terms and conditions that are substantially equal or equivalent, and the Department's interpretation of the statute failed to consider these requirements."

[¶ 15] As we have often stated, our rules of statutory construction focus on discerning the legislature's intent. In doing so, we begin by making an " 'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.' " *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker*, 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in *pari materia. State Department of Revenue and Taxation v. Pacificorp*, 872 P.2d 1163, 1166 (Wyo.1994).

[¶ 16] We interpreted the relevant statutory language in *BP*, ¶¶ 15–23, 112 P.3d at 604–08, and concluded that the DOR had properly chosen the comparable value method to determine the value of natural gas processed at the Whitney Canyon processing plant. Because there are many similarities between the case at bar and the *BP* case, it is worthwhile for us to review the specifics of *BP*. In that case, four producers built the Whitney Canyon processing plant to process gas produced from the Whitney Canyon field.

They executed a construction and operating agreement, which included a standardized processing agreement. Each of the producers signed a separate copy of the processing agreement, agreeing to pay a 25% in-kind processing fee. *BP*, ¶ 4, 112 P.3d at 600. The DOR considered each agreement between the producer and the plant as a separate comparable and used the 25% processing fee deduction in the comparable value method to determine the fair market value of each taxpayer's gas production.

[¶ 17] The Whitney Canyon taxpayers claimed that they were not "other parties" with regard to processing agreements with the plant and, consequently, the agreements could not be used to establish the processing fee under § 39–14–203(b)(vi)(B). *BP*, ¶ 7, 112 P.3d at 601. They also argued that the processing fee agreements did not pertain to gas of "like quantity" and the quality, terms, and conditions of the processing fee agreements were not comparable. *Id.* The SBOE rejected the taxpayers' arguments and we affirmed that decision. *Id.*, ¶¶ 8–9, 112 P.3d at 601. Specifically, we upheld the DOR's use of the taxpayers' processing agreements with the Whitney Canyon plant as comparables to determine the processing fee deduction for use in the comparable value method. *Id.*, ¶ 26, 112 P.3d at 608–09.

[¶ 18] *BP's* discussion of the statutory language is of particular importance to the instant case. The taxpayers argued that the statutory terms "other parties," "like quantity," and "quality, terms, and conditions" were ambiguous. *BP*, ¶ 19, 112 P.3d at 606. We criticized the taxpayers for focusing on the individual statutory terms rather than looking at the overall legislative intent, reasoning that the taxpayers' argument missed the "forest" for the "trees." *Id.* We stated:

> Looking at the context of these words, we find that the objective of the comparable value statute is for the Department to find reliable information about processing fees paid by other taxpayers in similar situations, from which the Department can make reasonable inferences as to a particular taxpayer's processing costs.

*BP,* ¶ 19, 112 P.3d at 606. Based on that determination, we concluded that it was unnecessary to further define the individual terms of the statute. *Id.,* ¶ 20, 112 P.3d at 606–07.

[¶ 19] The same rationale applies with equal force here. Chevron's argument that the DOR may only consider agreements which pertain to quantities, qualities, terms, and conditions "substantially equal" or equivalent to Chevron's Carter Creek processing circumstances is not persuasive. Like we said in *BP,* the intent of the legislature was for the DOR to locate reliable information about processing fees paid by other taxpayers in similar situations and make reasonable inferences from that information to determine a particular taxpayer's processing costs. It is neither determinative nor helpful to further define the statutory term "comparable" as meaning "substantially equal" or equivalent.

■ [¶ 20] With our mission firmly in mind, we turn now to Chevron's specific criticisms about the DOR's use of the comparable value method, in general, and the 25% processing fee, in particular. The DOR concluded that several agreements provided comparable processing fees to value Chevron's Carter Creek production and that the 25% processing fee yielded an accurate deduction for calculation of the fair market value of Chevron's gas. After the contested case hearings, the SBOE generally agreed with the DOR's position.[2]

[¶ 21] On appeal, Chevron continues to find fault with some aspect of each agreement, arguing that the quantities, qualities, terms, and/or conditions were not sufficiently similar to justify using them in the comparable values method. The DOR responds with a compelling argument—the specific differences between Chevron's Carter Creek situation and the other agreements are not determinative because, regardless of the dif-

ferences, the maximum processing fee applied to any producer under any agreement was 25%, and the DOR gave Chevron a processing deduction of the maximum fee. Chevron claims that, by taking this stance, the DOR is ignoring the directive of the statute which requires consideration of similarities in quantity, quality, terms, and conditions. The statute does reference those factors, but only in the context of finding comparable situations to determine the processing fee. Like the taxpayers in *BP,* Chevron fails to see the "forest" for the "trees." The whole point of the statute is to determine what processing fee deduction should be applied to an individual taxpayer's production. If the factors do not change the fee, then there is no need to reject any particular agreement as a comparable simply because it does not pertain to similar quantities, qualities, etc.

[¶ 22] The SBOE identified the Whitney Canyon processing agreement, which we considered in *BP,* as a comparable agreement to establish a processing fee for Chevron's Carter Creek gas. Under the Whitney Canyon agreement, the producers paid a 25% in-kind fee for processing their gas. The Whitney Canyon plant and the Carter Creek plant have numerous similarities. Of greatest significance, they process sour gas from the same reservoir, and each of the plants is capable of, and actually has, processed gas that is usually dedicated to the other plant. There are also a few differences between the plants which, according to Chevron, preclude the Whitney Canyon processing agreement from being a suitable comparable to establish the processing fee for the Carter Creek plant. The differences emphasized by Chevron on appeal are: (1) The Whitney Canyon agreement does not satisfy the "other party" requirement of the statute because Chevron is a party to it; and (2) the Whitney Canyon gas is not processed under sufficiently simi-

---

2. A significant amount of the evidence presented to the SBOE was labeled "confidential." In *Amoco Prod. Co. v. Wyoming State Board of Equalization,* 882 P.2d 866 (Wyo.1994), we recognized the inherent difficulty of applying and discussing an appraisal method which requires the use of confidential information. We have attempted, in this case, to follow the lead of the parties and the SBOE by protecting the confidential information to the extent we can, while still discussing the legal and factual matters necessary to our decision. Thus, some of our discussion includes general statements about the evidence presented to the SBOE rather than the precise details contained in the record.

lar "terms and conditions" because the two plants have "vastly different" operations. Our *BP* decision is dispositive of Chevron's argument about it not being an "other party" to the Whitney Canyon agreement. Chevron and the other appellants in *BP* operated in different roles as producers and processors at Whitney Canyon. Thus, they were "other parties" for the purposes of *BP*, ¶¶ 21–25, 112 P.3d at 607–08, and, for the same reasons, the Whitney Canyon agreement satisfies the "other parties" requirement in this case.

[¶ 23] With regard to the claim that the Whitney Canyon agreement is not comparable because the "terms and conditions" of processing are different, Chevron points to Carter Creek's initial higher capital construction costs and claims that the plant has higher annual operating costs. Chevron contends that the higher costs result from additional equipment employed at the Carter Creek plant to satisfy its more stringent air quality permit. There was conflicting evidence at the contested case hearings about whether or not the operating costs at the Carter Creek plant were actually greater than the Whitney Canyon plant and, if so, whether the 25% processing fee adequately covered the additional operating costs and provided Chevron a return on its investment in the Carter Creek plant.

[¶ 24] Although Chevron identified differences in capital construction costs and the processing system, the SBOE accepted the DOR's evidence showing that the average operating costs for both plants were very similar. After considering all of the evidence, the SBOE concluded that the 25% processing fee allowed Chevron to cover its operating expenses, and, although the Carter Creek plant has additional equipment to satisfy its more restrictive air quality permit, it still realized a significant return on its investment in the Carter Creek plant. The SBOE stated:

> We find the similarities between the Carter Creek Gas Plant and the Whitney Canyon Gas Plant to be so great that each offers a reliable reflection of how the other would treat a specific taxpayer if it were a third party producer requiring the services

of a gas processing plant. We reach this finding because both plants process the same composition of high sulfur gas. In fact, before the gas is produced it would be impossible to predetermine which plant would process the gas. While the plants have some slight differences, each serves the same producers from the same fields with the same ultimate goal, to process gas for sale of NGLs [natural gas liquids] and residue gas. Therefore, we find the processing fee charged to producers who have gas processed at the Whitney Canyon Gas Plant is a comparable fee with respect to producers who process gas at the Carter Creek Gas Plant.

There is substantial evidence in the record to support the SBOE's conclusions. Consequently, we agree that the Whitney Canyon processing agreement, with its 25% processing fee, was an appropriate comparable.

[¶ 25] The SBOE also concluded that the agreement between Chevron and Exxon to process Exxon's Road Hollow gas at the Carter Creek plant was a valid comparable to establish a processing fee for Chevron's Carter Creek production. The Road Hollow agreement included a sliding scale processing fee with a maximum in-kind fee of 25%. The fee decreased as Exxon sent greater volumes of Road Hollow gas to the Carter Creek plant for processing, up to the contractual maximum of 25 million cubic feet per day. Chevron argues that the Road Hollow agreement is not comparable because the quantities, qualities, and/or terms and conditions of processing the Road Hollow gas are not sufficiently similar to Chevron's circumstances in processing its Carter Creek gas.

[¶ 26] Considering the differences in quantity first, we recognize that the majority of the gas processed at the Carter Creek plant is Chevron's own gas, and the volumes processed for Exxon are much smaller. Chevron argues that it processes these smaller amounts of gas for other producers in order to maximize the total volume of gas processed through its plant. In other words, the Carter Creek plant has capacity to process gas in addition to Chevron's own gas, and it is beneficial for Chevron to contract to process these lesser amounts of gas for other

producers in order to increase the total amount of gas processed at the Carter Creek plant. Chevron describes this production as "incremental gas" or "incremental loading." Chevron argues that "[t]he processing fee for incremental gas is not representative of the actual expenses a processor incurs for processing large amounts of gas." Chevron's argument about quantity falls apart when we recognize that 25% is the maximum fee charged to Exxon under the Road Hollow agreement, and the processing fee actually decreases as the volume of gas increases. Thus, Chevron has no basis to complain about the 25% fee for processing its larger volumes of gas at the Carter Creek plant, when, if the terms of the Road Hollow agreement were strictly applied to Chevron, the fee would actually be less.

[¶ 27] Chevron also argues that the quality of gas processed and other terms and conditions of processing under the Road Hollow agreement are different from Chevron's Carter Creek production, making it improper to use the Road Hollow agreement to set a processing fee for its Carter Creek gas. With regard to quality, the Road Hollow gas is "sweeter," *i.e.*, has smaller levels of hydrogen sulfide, than Chevron's Carter Creek gas. However, the record establishes that the Road Hollow gas is intermingled with the Carter Creek gas at the inlet to the plant and consequently travels through the same process as the other gas. In addition, there is no indication that the processing fee charged to Exxon depends on the quality of the gas.

[¶ 28] Chevron argues that the "terms and conditions" under which Exxon's Road Hollow gas is processed differ, making the Road Hollow gas incomparable. Chevron's argument in this regard concerns the contractual priority of the gas. Priority refers to the order used to determine which production will be "shut-in" or not accepted for processing if the plant's capacity is insufficient to process all of the gas coming into it. Although there is different information in the record about whether or not Exxon's Road Hollow gas has third or fourth priority at the Carter Creek plant, it is clear that Exxon's gas is lower priority than Chevron's first priority gas. Thus, Exxon's Road Hollow gas will be shut in before Chevron's Carter Creek gas. Chevron suggests that priority makes a difference in the fee charged for processing the gas; however, it points to no specific credible evidence to support that position. As we explained above, Chevron's complaints about differences in qualities and "terms and conditions" of the agreements are unavailing because, regardless of the quality of the gas or the terms and conditions of production, the fee charged to any producer was never greater than 25%, which was the fee applied by the DOR to Chevron's Carter Creek production.

[¶ 29] The SBOE found other agreements, in addition to the Whitney Canyon and Road Hollow agreements, to be comparable. To avoid unnecessarily belaboring our analysis, we will not discuss the details of those agreements or how they relate to the Carter Creek production. We simply recognize that the maximum processing fee charged under any agreement was 25%, which is the processing deduction used by the DOR in calculating the fair market value of Chevron's Carter Creek gas. The record contains substantial evidence to support the DOR's selection of the comparable value method and the 25% processing fee deduction.

[¶ 30] Chevron has also failed to meet its burden of proving that the DOR's valuations for production years 2000 and 2001 do not reflect the fair market value of its Carter Creek natural gas production. Because the DOR's valuations are presumed valid, accurate, and correct, Chevron had the burden of presenting credible evidence to overcome the presumption and a mere difference of opinion is not sufficient. *BP*, ¶ 26, 112 P.3d at 608; *Thunder Basin Coal Co. v. Campbell County*, 2006 WY 44, ¶ 48, 132 P.3d 801, 816 (Wyo. 2006). In this case, the DOR appropriately chose the comparable value method to evaluate Chevron's production and identified suitable comparable processing agreements for use of the method. As we discussed above, the 25% processing fee was the highest fee charged under any of the contracts, and the DOR gave Chevron the full deduction based on that fee, even though some contracts

charged a lower fee for greater volumes of gas (like the volumes Chevron processes at the Carter Creek plant). Simply because application of another method, like the proportionate profits method advocated by Chevron in this case, would result in a greater processing deduction and, consequently, a lower taxable value, does not warrant a finding that the DOR's chosen method did not yield a fair market value. Although there was conflicting evidence on the costs attributable to the Carter Creek processing plant, there was substantial evidence to support the DOR's valuation of the natural gas production.

[¶ 31] Chevron's overriding contention is that its chosen valuation method, the proportionate profits method, gives a better estimate of fair market value than the comparable value method. It is not our duty on appeal "to determine which of various appraisal methods is best or most accurately estimates FMV [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [particular] method of appraisal, and, if so, whether substantial evidence exists to support the manner in which it was used." *RT Communications, Inc.*, 11 P.3d at 921, (citations omitted). *See also Thunder Basin Coal Co.*, ¶ 14, 132 P.3d at 807. The record in this case is more than sufficient to support the DOR's choice and application of the comparable value method for valuing Chevron's Carter Creek production in 2000 and 2001.

### 2. *Equality and Uniformity in Taxation*

[¶ 32] Chevron argues that the DOR treated Chevron in an inequitable and non-uniform manner in violation of the equal protection clauses of the United States and Wyoming constitutions when it used the comparable value method, instead of the proportionate profits method, to appraise Chevron's Carter Creek production. Wyo. Const. art. 1, § 34 provides that all laws of a general nature shall have uniform operation. Art. 15, § 11 provides that the gross product of minerals shall be valued at its full value and "[a]ll taxation shall be equal and uniform within each class of property." *See also* U.S. Const. amend. XIV.

[¶ 33] Chevron claims it was subject to disparate treatment because the DOR denied its request to use the proportionate profits method to value its production but allowed other taxpayers, who process gas through the Lost Cabin, Garland, JT, and Oregon Basin plants, to use the proportionate profits method to value their production. Chevron claims that the resulting differences in taxation from application of the two methods are so significant its constitutional rights were violated. For example, Chevron points out that the producer/processors of the Lost Cabin plant (which includes Chevron) receive a significantly larger processing deduction through application of the proportionate profits valuation method than the 25% processing deduction Chevron receives on its Carter Creek production through application of the comparable value method.

[¶ 34] Faced with a similar argument in *BP*, we stated:

> The Board's review indicates that the Department has selected the comparable value methodology for all taxpayer-producers for sales away from the point valuation and all of them responded that no comparable value existed. The Department investigated and found that while that was true for some taxpayer-producers, that was not the case for these taxpayers. The Board concluded that the evidence supported distinguishing the operations at Whitney Canyon from the other facilities. Our review shows that this finding is supported by substantial evidence, and we agree with the legal conclusion that neither the statute nor the constitution has been violated. We agree with the Board's conclusion that uniformly achieving taxation based upon accurate fair market value may well require application of different methodologies to similarly situated mineral taxpayers if comparable values differ in processing agreements or different cost structures exist.

*BP*, ¶ 30, 112 P.3d at 609–10. As we noted earlier, the *BP* decision pertained to valuation of the natural gas processed at the Whitney Canyon plant during 2000. Thus, that case is not only legally relevant, but due to the similarities of the Carter Creek and

Whitney Canyon plants and the production years at issue, it is also factually relevant.

[¶ 35] The DOR directed all producers to use the comparable value method to value their production unless there were no comparables. Simply because the DOR was unable to apply the comparable value methods to a few producers because of a lack of appropriate information does not mean it was inequitable to apply the comparative value method to Chevron when there were comparables for the Carter Creek plant. There is no basis for finding Chevron was subjected to taxation in violation of its equal protection rights.

## CONCLUSION

[¶ 36] Substantial evidence exists in the record to support the SBOE decisions that the DOR properly chose the comparable value method for Chevron's Carter Creek production for 2000 through 2002, and Chevron has not demonstrated any errors in application of the comparable value method for production years 2000 and 2001. Moreover, Chevron has failed to demonstrate that it was subjected to inequitable or non-uniform taxation in violation of the equal protection rights guaranteed in the Wyoming and United States constitutions.

[¶ 37] Affirmed.