2006 WY 144

**Mark A. DORR, Appellant (Petitioner),**

v.

**The WYOMING BOARD OF CERTI-FIED PUBLIC ACCOUNTANTS,**
Appellee (Respondent).

**No. 06–12.**

Supreme Court of Wyoming.

Nov. 9, 2006.

944

Representing Appellant: Greg L. Goddard of Goddard, Wages & Vogel, Buffalo, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Kennard F. Nelson, Senior Assistant Attorney General; Douglas W. Weaver, Special Assistant Attorney General. Argument by Mr. Weaver.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] After an extensive contested case hearing, the Wyoming Board of Certified Public Accountants' (the Board) concluded Mark A. Dorr had violated the terms of a settlement agreement which resolved a former disciplinary action. The Board also found him in violation of certain provisions of the Wyoming Certified Public Accountant's Act, Wyo. Stat. Ann. § 33–3–101 et. seq. (LEXIS 1999). Consequently, the Board suspended Mr. Dorr's certificate to practice public accounting in Wyoming. After reviewing the entire record, we conclude the Board's decision is supported by substantial

* Chief Justice at time of oral argument.

evidence, is not arbitrary or capricious, and is otherwise in accordance with law.

[¶ 2]   We affirm.

## ISSUES

[¶ 3]   Mr. Dorr phrases his appellate issue as:

1.  Whether the district court erred when it adopted the reasoning set forth in the brief of respondent the Wyoming Board of Certified Public Accountants and affirmed the Wyoming Board of Certified Public Accountants' December 16, 2004, *Board Decision Suspending Certificate and Permits to Practice.*

The Board poses the following issues on appeal:

1.  Is the Wyoming Board of Certified Public Accountants' decision suspending Dorr's certificate and permits to practice supported by substantial evidence and according to law?
2.  Did Dorr violate W.S. § 33–3–121[ (a)(ii) ]?
3.  Was pre-issuance review defined, and was a pre-issuance [review] done?
4.  Did Dorr receive a fair hearing?

## FACTS

[¶ 4]   Some of the underlying facts of this case are set forth in *Dorr v. Wyoming Bd. of Certified Pub. Accountants*, 2001 WY 37, 21 P.3d 735 (Wyo.2001) (*Dorr I*).   The Board filed a disciplinary complaint against Mr. Dorr in 1999.   *Dorr I*, ¶ 3, 21 P.3d at 737. The parties resolved their dispute by entering into a settlement agreement, which stated in pertinent part:

13.  As of the date of this agreement, Dorr agrees to limit the scope of his practice to exclude all audits.   Prior to re-entry into audit practice, Dorr agrees to petition the Board for approval and agrees to a review of a post agreement audit engagement by a firm approved by the Board's representative.   This review is to demonstrate to the Board [that] Dorr is competent to perform audits.   The scope of the review is to be a "pre-issuance" review, the

requirements of which are less in scope and magnitude than a peer review.   Dorr further agrees to reimburse the Board for the costs associated with this review. Should Dorr re-enter the audit practice, he further agrees to undergo peer review in compliance with the Board Rules and Regulations.

14.  Dorr shall fully comply with the Certified Public Accountant's Act of 1975, and the Board's administrative rules and regulations.   Specifically, Dorr shall fully comply with Wyo. Stat. § 33–3–119.

15.  Dorr agrees that the Board shall retain continuing jurisdiction over him to take further action as may be necessary to conclude this matter.

16.  Dorr agrees that in the event he fails to comply with all terms of this agreement, and after notice and the opportunity to be heard, he will voluntarily surrender to the Board all permits and certificates held by him for a one (1) year suspension for discipline.   Dorr may petition and appear before the Board to show cause as to why his certificates and permits should be reinstated after the one (1) year suspension has been served.

In *Dorr I,* the Board suspended Mr. Dorr's license to practice public accounting after finding he had violated the terms of the settlement agreement and various statutes. *Dorr I,* ¶ 7, 21 P.3d at 738–41.   We vacated the Board's decision because it was not supported by the record.   *Dorr I,* ¶ 21, 21 P.3d at 745.

[¶ 5]   On July 9, 2002, a Board committee filed another complaint against Mr. Dorr, alleging new violations of the settlement agreement and the laws and regulations pertaining to certified public accountants.   In particular, the committee claimed Mr. Dorr had violated the settlement agreement by engaging in audit practice in 2000 and 2001 when he participated in audits of the financial records of the Sixth Judicial District Child Support Authority (CSA).   The committee also asserted his actions violated the Wyoming Certified Public Accountant's Act because they were dishonest and reflected adversely on his fitness to practice public accounting.

[¶ 6]   In September 2002, Mr. Dorr filed a declaratory judgment action and a motion for a stay, asking the district court to halt the administrative proceeding.   The district court dismissed the declaratory judgment action because Mr. Dorr had not exhausted his administrative remedies.   In November 2003 and January 2004, a hearing examiner and a Board adjudicatory panel held a six-day contested case hearing on the disciplinary complaint.   During the hearing, Mr. Dorr's attorney learned there were many documents in the committee's possession which had not been provided to him in discovery.   The hearing officer ordered the committee to produce all non-privileged documents to Mr. Dorr after the hearing and ruled the evidence would remain open until the discovery matters were resolved. The hearing officer performed an in-camera review of the documents the committee claimed were privileged and ordered some of them to be produced to Mr. Dorr.

[¶ 7]   Mr. Dorr identified 112 additional exhibits for admission into evidence.   The hearing officer denied admission of 111 of the proposed exhibits on the basis they were irrelevant, immaterial, or unduly repetitious under Wyo. Stat. Ann. § 16–3–108 (Lexis-Nexis 2005) and/or they had been available to Mr. Dorr prior to the hearing and his request for admission was, therefore, untimely. The hearing officer closed the evidence and ordered the parties to submit written findings of fact and conclusions of law.

[¶ 8]   The Board submitted its proposed findings of fact, conclusions of law and decision, but Mr. Dorr apparently elected not to submit his proposed findings, conclusions and decision.   Instead, he filed motions in the district court to compel, renew his earlier declaratory relief action and stay the agency proceedings.   Before Mr. Dorr's motions were heard by the district court, the Board issued its decision suspending Mr. Dorr's privilege to practice public accounting in Wyoming.   Mr. Dorr filed a petition for review with the district court.   The district court affirmed the Board's decision, and Mr. Dorr filed a notice of appeal with this Court.[1]

1.   The declaratory judgment action is not before

## STANDARD OF REVIEW

[¶ 9]   This case involves a disciplinary action under the provisions of Wyoming's Certified Public Accountant's Act. Sections 33–3–101 through 33–3–132.   The act directs that proceedings before the Board are to be conducted in accordance with the Wyoming Administrative Procedures Act (§§ 16–3–101, et.seq.).   Section 33–3–123.   The Wyoming Administrative Procedures Act sets forth the scope of appellate review for agency decisions:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.   In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.   The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed;  and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law;  or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Section 16–3–114(c).

[¶ 10]   We review an administrative decision as if it came directly from the agency and do not defer to the district court's ruling.   *Veile v. Bryant,* 2004 WY 107, ¶ 9, 97 P.3d 787, 792 (Wyo.2004).   An

us in this appeal.

agency's "conclusions of law are afforded no special deference and will be affirmed only if truly in accordance with law." *Hermosillo v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo.2002). *See also, Penny v. State ex. rel. Wyo. Mental Health Professions Licensing Bd.*, 2005 WY 117, ¶ 12, 120 P.3d 152, 160 (Wyo.2005). We examine the entire record to determine if the agency's findings of fact are supported by substantial evidence. *See, RT Communications, Inc. v. State Bd. of Equalization*, 11 P.3d 915, 920 (Wyo.2000), *Laramie County Bd. of Equalization v. Wyo. State Bd. of Equalization*, 915 P.2d 1184, 1189 (Wyo.1996). So long as the agency's findings of fact are supported by substantial evidence, we will not substitute our judgment for that of the agency. *RT Communications*, 11 P.3d at 920. We define substantial evidence as being more than a scintilla of evidence. *Id.* It is evidence that a reasonable mind might accept in support of the agency's conclusions. *Id.*

[¶ 11] "Even if the Board's factual findings are found to be supported by sufficient evidence, the ultimate agency decision may be found to be arbitrary or capricious for other reasons." *Billings v. Wyo. Bd. of Outfitters and Prof'l Guides*, 2004 WY 42, ¶ 8, 88 P.3d 455, 462 (Wyo.2004). We "examine the conflicting evidence to determine if the Board could have reasonably made its findings and order upon all of the evidence before it." *Id.* The arbitrary and capricious review is intended to be a "safety net" to catch other improper agency actions. *Penny*, ¶ 12, 120 P.3d at 160.

## DISCUSSION

[¶ 12] Although Mr. Dorr presents a single issue on appeal, his argument is multi-faceted and requires the resolution of a number of legal issues. In general, Mr. Dorr argues the record does not support the Board's conclusions he violated the terms of the settlement agreement, the Wyoming Certified Public Accountant's Act, or the Board's rules and regulations. He also asserts the language of the settlement agreement, the procedures followed in the contested case

hearings, and the Board's ultimate decision violated his due process rights.

[¶ 13] In addressing Mr. Dorr's arguments, we are cognizant that disciplinary actions before licensing boards are subject to a more exacting level of proof than typical administrative actions. In *Dorr I*, we stated:

A disciplinary proceeding before a licensing board is an adversary proceeding where the burden is on the complaining party to present its case in a proper manner and to state with precision the charges against the licensee. *Devous v. Board of Medical Examiners*, 845 P.2d 408, 416 (Wyo.1993). Those charges must be established by clear and convincing evidence. *Id.; Painter v. Abels*, 998 P.2d 931, 939–40 (Wyo.2000). We have defined clear and convincing evidence to be the "kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *Meyer v. Norman*, 780 P.2d 283, 291 (Wyo.1989) (quoting *MacGuire v. Harriscope Broadcasting Company*, 612 P.2d 830, 839 (Wyo.1980)).

*Dorr I*, ¶ 8, 21 P.3d at 741.

### A. Did Mr. Dorr Violate the Settlement Agreement by Participating in the 2000 and 2001 CSA Audits?

[¶ 14] In Paragraph 13 of the settlement agreement, Mr. Dorr agreed to "limit the scope of his practice to exclude all audits," and to petition the Board for approval prior to re-entry into "audit practice." The committee asserted he had violated the terms of the settlement agreement by participating in the 2000 and 2001 CSA audits without obtaining the Board's permission. The Board agreed with the committee's contentions and concluded Mr. Dorr had violated the terms of the settlement agreement. The Board issued the following pertinent findings of fact:

6. By letter of April 28, 2000, Mr. Dorr petitioned the Board "to begin audit work for the sole purpose of a 'pre-issuance' review." He indicated that he had no audit clients nor had he approached any potential audit clients at the time of that request. But, would do so only if such permission was granted

by the Board. Mr. Dorr mentioned that the Sixth Judicial District Child Support Authority (hereinafter "CSA") would be a likely potential client.

7. By letter dated May 8, 2000, the Board denied Mr. Dorr's request to reenter the audit practice at that time.

8. On July 10, 2000, the CSA requested Mr. Dorr and his firm CPA Network submit a proposal to perform its fiscal year 2000 financial and compliance audit (hereinafter "2000 CSA audit").

9. On July 21, 2000, Mr. Dorr and CPA Network responded to the CSA request for proposal by stating that:

... We will be happy to perform the same services as we have in the past. As you requested, below is the fee to complete the audit of your financial statements for the year ending June 30, 2000. This fee is based on the assumption that your records will be available for examination in the August through October time frame.

The purpose of the engagement would be to audit the Authority's financial statements for the year ending June 30, 2000 and evaluate the fairness of presentation of the statements in conformity with generally accepted accounting principles.

10. On July 26, 2000, the CSA accepted Mr. Dorr's and CPA Network's proposal to audit its financial statements for the year ending June 30, 2000. The CSA letter also stated, "Thank you for your commitment to continue providing audit services for our agency."

11. The record is replete with evidence that Mr. Dorr and CPA Network performed audit practice for CSA during 2000, including:

(a) Carol Kinney, Executive Director for CSA, testified that she recalled Mr. Dorr being on-site working on the CSA audit and asking questions of her concerning it.

(b) The CSA represented to Wyoming Family Services on September 22, 2000, that CPA Network was conducting its audit of financial statements and that forms were to be sent to CPA Network.

(c) Julie Ann Pierce testified that she was Mr. Dorr's/CPA Network's employee; that Mr. Dorr supervised the 2000 CSA audit; and that he was the ultimate decision-maker for the 2000 CSA audit;

(d) CPA Network billed CSA for audit services, from October 17 through November 13, 2000, including planning, field work, review and research, performed by Ms. Pierce;

(e) Ms. Pierce by letter of December 6, 2000 to Dennis Oberhelman, asserts that CPA [N]etwork has performed the 2000 CSA audit by compiling data and drafting the audit report.

(f) Payment for the 2000 CSA audit was provided to CPA Network; and

(g) Mr. Dorr and Ms. Pierce presented the 2000 CSA audit at the January 17, 2001, CSA Board Meeting, which was billed by Mr. Dorr.

12. During the time that services were performed in association with the 2000 CSA audit, neither Mr. Dorr nor CPA Network were authorized by the Board to perform or re-enter the audit practice, pursuant to the Settlement Agreement or Board Order.

13. On June 20, 2001, the CSA requested Mr. Dorr and his firm CPA Network submit a proposal to perform its fiscal year 2001 financial and compliance audit (hereinafter "2001 CSA audit").

14. On July 6, 2001, Mr. Dorr and CPA Network responded to the CSA request for proposal by stating that they would perform the audit for the year ending June 30, 2001.

15. On August 3, 2001, the CSA informed Mr. Dorr and CPA Network of its acceptance of the proposal to audit its financial statements for the 2001 CSA audit.

16. Both on July 6 and August 17, 2001, Mr. Dorr performed audit planning for the 2001 CSA audit, which time he billed as services.

17. By letter of October 5, 2001, Mr. Dorr requested that CSA provide him with

schedules, workpapers and items needed to perform the 2001 CSA audit.

18. By letter of November 5, 2001, Mr. Dorr petitioned the Board for its approval to allow him to reenter the audit practice and for approval of Dennis Oberhelman to perform the pre-issuance review, required by the Agreement.

19. The Board approved Mr. Dorr's request on November 8, 2001, to reenter the audit practice and begin performing the 2001 CSA audit. However, the Board was still considering the approval of a pre-issuance reviewer.

20. On or about November 14, 2001, Mr. Dorr/CPA Network employed John Rummel to perform field work for the 2001 CSA audit. That work was performed through December 10, 2001.

21. From the time period of November 14 to 30, 2001, Mr. Rummel and Mr. Dorr substantially completed the required field work for the 2001 CSA audit.

22. On November 20, 2001, the Board denied Mr. Dorr's proposed pre-issuance reviewer, Mr. Oberhelman[,] and invited him to select another pre-issuance reviewer.

23. Mr. Dorr withdrew his petition to the Board seeking approval to reenter the audit practice on December 13, 2001. That request to withdraw was accepted by the Board on December 19, 2001.

24. Even after Mr. Dorr requested to withdraw his petition to the Board seeking to reenter the audit practice, he continued to perform audit practice steps by completing and signing Control Risk Assessment and Inherent Risk Assessment Forms.

25. By letter of December 31, 2001, Mr. Dorr and CPA Network informed CSA that he was "assigning" all rights to perform the 2001 CSA audit, to Dennis Oberhelman. This was the first time that CSA was informed that Mr. Dorr and CPA Network had licensing problems related to audit practice with the Board.

26. The CPA Network billed CSA for services performed on the 2001 CSA au-

dit, in the amount of $1,675.00 on November 20, 2001.

27. The CSA paid CPA Network for services performed on the 2001 CSA audit.

28. On January 16, 2002, Mr. Dorr appeared in person to deliver the 2001 CSA audit report/opinion to the CSA Board. Mr. Dorr also explained why he eventually "assigned" the audit to Mr. Oberhelman.

29. Even though Mr. Oberhelman signed both the 2000 and 2001 CSA audit reports/opinions, his only other involvement included very limited supervision and review.

30. Mr. Dorr's primary contention that neither CPA Network nor he were engaged in auditing or audit practice, as prohibited by the Settlement Agreement, in relation to both the 2000 and 2001 CSA audits, was that he did not sign the audit reports/opinions. [Mr. Dorr contended] that Mr. Oberhelman solely and totally performed both CSA audits, exclusively based upon his signing the audit reports/opinions.

31. Several CPAs, called as witnesses by both the Board Committee and Mr. Dorr, presented opinion testimony at the hearing concerning what is included in audit practice. David Kreycik, James Hearne, Ronny Farmer, Mike Nelson and Don Gruenler collectively provided that the following activities are considered auditing and auditing practice:

a. Planning audit procedures;

b. Performing and supervising field work;

c. Reviewing field work;

d. Examining financial statements;

e. Examining client accounts;

f. Investigating and weighing evidence;

g. Determining accuracy of entries;

h. Reviewing and examining vouchers;

i. Verifying that financial statements are fairly stated;

j. Reviewing confirmations for accuracy and ensuring that they are returned to the auditors;

k. Determining that selected transactions are accurately accounted for; and/or

l. Delivering and discussing audit report/opinion with client.

32. Gerald Marburger, Mr. Oberhel[man] and Mr. Farmer, all CPAs, testified that responding to a request for proposal for audit services and receiving notification that the client has accepted a submitted proposal is audit practice.

33. Mike Nelson, CPA, an expert presented by Mr. Dorr, testified that his own firm of Chadwick, Steinkircher, Davis & Co., is engaged in audit practice when they perform audit procedures, even though they do not sign the final audit report/opinion. That testimony directly refutes Mr. Dorr's contention that neither CPA Network nor he engaged in audit practice related to both the 2000 and 2001 CSA audits, because he did not sign the reports/opinions.

34. Mr. Nelson further testified that audit practice encompasses more than simply signing an audit report/opinion. He provided that audit practice includes:

a. Accepting a client to conduct an audit;

b. Planning the audit;

c. Supervising audit field work;

d. Reviewing audit field work;

e. Examining financial statements;

f. Examining accounts;

g. Comparing vouchers; and

h. Reviewing and sending confirmations.

35. Ronny Farmer, CPA, opined that Mr. Dorr and CPA Network were engaged in the audit practice related to the June 30, 2000 and/or June 30, 2001, CSA audits by:

a. Agreeing to provide audit service to CSA;

b. Supervising Ms. Pierce during the field work;

c. Requesting items from CSA to perform the audits;

d. Sending confirmations indicating that CPA Network was CSA['s] auditor;

e. Drafting financial statements and audit report/opinion; and

f. Receiving payment from CSA for performing audit procedures[.]

36. Mr. Oberhelman, a witness called by Mr. Dorr,[2] opined that completing and signing Control Risk Assessment and Inherent Risk Assessment Forms, as done by Mr. Dorr[,] was audit practice. He also testified that CSA was Mr. Dorr's only audit client.

37. Mr. Dorr himself testified that completing Control Risk Assessment and Inherent Risk Assessment Forms, as was done for CSA[,] is auditing and a step in audit practice.

[¶ 15] In its decision, the Board stated: "The definitive issue presented is whether or not Mr. Dorr and CPA Network violated the Settlement Agreement by reentering the audit practice without first petitioning the Board and failing to obtain its prior approval to do so." The Board answered its question in the affirmative and ruled Mr. Dorr and CPA Network had violated the terms of the settlement agreement by performing audits for CSA in 2000 and 2001 without properly obtaining Board approval. The Board's conclusions of law pertaining to the settlement agreement stated:

14. Based upon the documentary evidence, lay testimony and expert opinions presented at the hearing in this matter as set forth in the Findings of Fact, above, and based upon Standards adopted by the Board, the Board concludes that the actions of Mr. Dorr and the CPA Network, LLC, performed, engaged in, conducted, constituted and entered audit practice, related to both the June 30, 2000 and/or June 30, 2001, Sixth Judicial District Child Support Authority audits.

15. The Board further concludes that the actions of engaging in and performing audit practice was in violation of the April 21, 1999, Settlement Agreement and Stipulation, Provision 13. The violation is that

2. Mr. Oberhelman was called as a witness by the Board.

Mr. Dorr and the CPA Network, LLC, failed to petition the Board for approval to reenter the audit practice prior to performing audit procedures and entering and engaging in audit practice for the June 30, 2000 and/or June 30, 2001, Sixth Judicial District Child Support Authority audits. * * *

18. Mr. Dorr and the CPA Network, LLC, further agreed in the Settlement Agreement and were ordered in the Order Accepting Settlement Agreement, that in the event he fails to comply with all terms of the Settlement Agreement, and after notice and the opportunity to be heard, he will voluntarily surrender to the Board all permits and certificates held by him for a one (1) year suspension for discipline.

19. Because Mr. Dorr and the CPA Network, LLC have violated the Settlement Agreement and/or the Board's Order Accepting Settlement Agreement, they are required to serve a one (1) year disciplinary suspension of all permits and certificates.

[¶ 16] Mr. Dorr argues the Board's decision is premised upon an incorrect finding that both he and CPA Network were prohibited, by the terms of the settlement agreement, from performing audits. When interpreting settlement agreements, we use our typical standard for interpreting contracts. *Mueller v. Zimmer*, 2005 WY 156, ¶ 18, 124 P.3d 340, 350 (Wyo.2005); *Exxon Corp. v. Bd. of County Comm'rs, Sublette County*, 987 P.2d 158, 165 (Wyo.1999).

> Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. And the contract as a whole should be considered, with each part being read in light of all other parts.

*Carlson v. Water Unlimited, Inc.*, 822 P.2d 1278, 1281 (Wyo.1991), quoting *Amoco Prod. Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463, 465 (Wyo.1980). *See also, Brockway v. Brockway*, 921 P.2d 1104, 1106 (Wyo.1996). The plain meaning of contractual language is the meaning reasonable persons would ascribe to the language at the time and place of its use. *Mullinnix LLC v. HKB Royalty Trust* 2006 WY 14, ¶ 23, 126 P.3d 909, 919 (Wyo.2006). Interpretation of an unambiguous contract is a matter of law. *Stevens v. Elk Run Homeowners' Ass'n*, 2004 WY 63, ¶ 12, 90 P.3d 1162, 1165–66 (Wyo. 2004).

[¶ 17] The settlement agreement listed the parties to the agreement as the Board and "Mark A. Dorr (Dorr), certified public accountant, d/b/a Dorr, Bentley & Pecha, L.L.C., The CPA Network." At all times relevant to this controversy, CPA Network was wholly owned by Mr. Dorr. Under Wyoming law, public accountants are issued "certificates" to practice and public accounting firms are issued "permits" to practice. *See,* §§ 33–3–109 and 33–3–118. The settlement agreement referred to Mr. Dorr's certificates and CPA Network's permits.

[¶ 18] Mr. Dorr claims that, despite the fact he was the sole owner of CPA Network, the business entity was not restricted in its ability to conduct audits by the terms of the settlement agreement. Instead, he argues, the restriction applied only to him, personally. He bases this argument on the language of Paragraph 13 which refers to Mr. Dorr as an individual in describing the restriction. Looking at the plain language of the entire settlement agreement, within the context of Wyoming law, it is clear the restriction applied to Mr. Dorr and CPA Network, at least to the extent it was a business entity owned exclusively by him. A reasonable person would interpret the settlement agreement and its attendant provisions to apply to both Mr. Dorr and his wholly owned accounting firm, CPA Network. In support of his position, Mr. Dorr points to the testimony of other accountants at the hearing suggesting it would be improper to limit one accountant's practice because of another accountant's disciplinary problems. Under other circumstances, such as if one partner in a firm is disciplined but another is not, that argument might be stronger. However, in this case, that argument rings hollow.

[¶ 19] The record contains ample evidence demonstrating Mr. Dorr, personally, participated in the 2000 CSA audit even

though the Board had denied his petition to reenter audit practice. A CPA Network clerical employee signed a letter for Mr. Dorr responding to CSA's request for a proposal to perform its audit for fiscal year 2000. Although Mr. Dorr argued Julie Pierce, another accountant working for CPA Network, conducted the 2000 CSA audit procedures on behalf of the firm, her testimony did not substantiate his position. Ms. Pierce testified she was not qualified to sign off on audits and Mr. Dorr was her supervisor and the ultimate decision maker on the audit. In addition, Carol Kinney, who began working as CSA's executive director in November 2000, while the audit was being conducted, testified Mr. Dorr and Ms. Pierce traveled to CSA's office to conduct the fieldwork.[3] She stated Mr. Dorr directed the work on-site and asked her specific questions about CSA files. The final audit report contained Mr. Oberhelman's signature; however, Ms. Kinney testified he did not appear at the CSA board meeting to present the report. Mr. Dorr and a female (presumably Ms. Pierce) appeared by telephone to present the 2000 audit. Mr. Dorr's presence at the meeting was confirmed by CSA's board minutes. The record, obviously, contains substantial evidence to sustain the Board's conclusion that the committee proved, by clear and convincing evidence, Mr. Dorr personally participated in the 2000 CSA audit.

[¶ 20] On July 6, 2001, Mr. Dorr and CPA Network responded to CSA's request for a proposal to perform its audit for fiscal year 2001, and CSA accepted the proposal on August 3, 2001. Mr. Dorr's billing statements showed he spent time planning the 2001 CSA audit on July 6 and August 17, 2001. On October 5, 2001, a CPA Network employee signed a letter on behalf of Mr. Dorr, requesting CSA to provide schedules, work papers and other documents necessary to perform the audit. On November 6, 2001, Mr. Dorr finally filed a petition with the Board for approval to perform an audit for CSA. However, as outlined above, by the time the Board approved his re-entry into audit practice on November 8, 2001, he had already engaged the audit and performed activities associated with it.[4]

[¶ 21] Because Mr. Dorr still had to successfully complete a pre-issuance review before he could fully reenter audit practice and issue the 2001 audit report to CSA, he proposed Mr. Oberhelman conduct the pre-issuance review. On November 20, 2001, the Board informed Mr. Dorr that Mr. Oberhelman would not be an acceptable pre-issuance reviewer because he had participated in the CSA audits in 1999 and 2000 and asked Mr. Dorr to select a different reviewer. Instead of proceeding with the pre-issuance review process, Mr. Dorr sent a letter to the Board dated December 13, 2001, revoking his request to be reinstated to audit practice. The Board accepted his request to withdraw his petition on December 19, 2001.

[¶ 22] Nevertheless, Mr. Dorr continued to perform work on the CSA audit by completing and initialing a control risk assessment on December 20, 2001, and an inherent risk assessment on December 21, 2001. On December 31, 2001, he informed CSA he had assigned the audit to Mr. Oberhelman. Mr. Oberhelman signed the audit report. As in prior years, Mr. Dorr participated in the CSA board meeting at which the audit report was presented, although this time Mr. Oberhelman attended the meeting as well. CPA Network submitted a bill to CSA for work performed on the 2001 audit, and received payment for its services. Without question,

3. One of the certified public accountants who testified at the hearing defined "fieldwork" as "the portion of the audit that's performed at the client's—or the entity's place of business, wherever their records are maintained."

4. Mr. Dorr indicated he believed he had the Board's oral permission to begin the CSA 2001 audit prior to November 8, 2001. He testified about a conversation between his attorney and the Board's attorney prior to submission of his petition to reenter audit practice in November 2001. The record contains a letter, dated October 12, 2001, from the Board's attorney to Mr. Dorr's attorney, confirming a telephone conversation about the procedure for Mr. Dorr to reenter audit practice. The letter does not, however, indicate Mr. Dorr had been granted oral permission to proceed with the audit. Mr. Dorr's argument that he had obtained oral permission to begin the 2001 CSA audit was not accepted by the Board, and Mr. Dorr has not convinced us the Board was mistaken in that regard.

there is substantial evidence in the record to support the Board's conclusion the committee proved, by clear and convincing evidence, Mr. Dorr participated in the 2001 CSA audit during times when he did not have Board approval to do so.

[¶ 23]  Mr. Dorr also claimed he was not engaged in "audit practice" because he did not sign the audit reports.  Instead, he maintained Mr. Oberhelman was CSA's auditor because he signed the reports for the 2000 and 2001 audits.  The plain language of the settlement agreement stated Mr. Dorr agreed to "limit the scope of his practice to exclude all audits" and, prior to reentering "audit practice," he would comply with certain requirements, including petitioning the Board for approval.

[¶ 24]  The plain meaning of the word "audit" is:  "An examination of records or financial accounts to check their accuracy." *American Heritage Dictionary of the English Language* (4th ed.2000).  The term "audit" can also be used to refer to the final report of an audit. *Webster's Third New International Dictionary* (2002).  By referring to "all audits" and "audit practice," the parties obviously agreed to the broader definition of "audit," including the process of examining records and financial accounts to check their accuracy.  Applying this meaning to the settlement agreement, it is clear Mr. Dorr was restricted from performing any aspect of an audit unless he first complied with the requirements of the settlement agreement.  Considering the broad definition of audit, it would border on nonsensical to interpret the restriction on "all audits" or "audit practice" in the settlement agreement as only prohibiting Mr. Dorr from signing an audit report.

[¶ 25]  Although it does not seem necessary to consider extrinsic evidence [5] of the meaning of audit under these circumstances, the parties presented considerable testimony about the meaning of the terms "audit" and "audit practice."  As outlined in detail in the Board's findings of fact, several certified public accountants testified there are numerous aspects of an audit,[6] including, without limitation:  engaging an audit client; hiring, training and supervising staff for the audit;  planning the audit procedures;  informing the client of what documents the auditor needs to examine;  performing, supervising, and/or reviewing fieldwork;  examining and verifying financial statements and accounts;  investigating and weighing evidence produced during the audit;  determining the accuracy of accounting entries;  reviewing vouchers;  sending out and reviewing confirmations from third parties;  preparing and signing risk assessment forms;  signing the audit report;  and delivering the audit report or opinion to the client.  Mr. Dorr admitted at the hearing that many of those activities were part of auditing and audit practice.

Mr. Dorr successfully elicited testimony from various certified public accountants indicating that signing the audit report is the culmination of the audit process and it would be difficult for an accountant to have a successful audit practice without having the ability to sign an audit report.  From that testimony, he argues he did not engage in auditing or an audit practice because he did not sign the CSA audit reports.  He conveniently ignores the evidence that CPA Network procured audit work, performed certain aspects of the audit and then had Mr. Oberhelman sign the report.  The evidence is clear Mr. Dorr's wholly owned accounting

---

**5.**  Extrinsic evidence of the meaning of a contractual term at the time and place of execution of the agreement is admissible even if the contract language is not ambiguous.  *See Mullinnix,* ¶¶ 22–28, 126 P.3d at 919–22.  Evidence of a specialized definition of a term may be presented to determine the plain meaning of contractual language. *Id.*

**6.**  It appears at least some of the certified public accountants' testimony was directed at complying with the expert testimony requirements set out in *Billings I* and *Devous.*  We encountered

an analogous situation in *Penny,* when we considered whether Mr. Penny had engaged in "clinical social work" without a license and concluded expert testimony was not necessary. *Penny,* ¶¶ 31–33, 120 P.3d at 170–71.  The parties in this case apparently proceeded as if expert testimony was necessary.  Consequently, the specific issue of whether expert testimony was required in order to establish whether Mr. Dorr violated the "audit" and/or "audit practice" terms of the settlement agreement is not presented to us.

firm, CPA Network, received payment for those services from CSA. Consequently, Mr. Dorr was able to sustain an audit practice without signing an audit report. The Board's conclusion that the activities engaged in by Mr. Dorr amounted to auditing and audit practice in violation of the settlement agreement is supported by substantial evidence.

### B. Did Mr. Dorr Violate the Wyoming Certified Public Accountant's Act?

[¶ 27] Mr. Dorr also claims the Board erred by finding him in violation of certain provisions of the Wyoming statutes pertaining to certified public accountants. To the extent this appeal requires statutory interpretation, we apply the following standard:

> We first decide whether the statute is clear or ambiguous. This Court makes that determination as a matter of law. A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability." A "statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations."

*Powder River Coal Co. v. State Bd. of Equalization,* 2002 WY 5, ¶ 6, 38 P.3d 423, 426 (Wyo.2002) (citations omitted). *State ex rel. Dep't. of Revenue v. Buggy Bath Unlimited, Inc.,* 2001 WY 27, ¶ 16, 18 P.3d 1182, 1187 (Wyo.2001).

*Diamond B Services v. Rohde,* 2005 WY 130, ¶ 15, 120 P.3d 1031, 1038–39 (Wyo.2005). *See also, Dorr I,* ¶ 9, 21 P.3d at 741. " 'If the language selected by the legislature is sufficiently definitive, that language establishes the rule of law....' " *Kunkle v. State ex rel. Wyo. Workers' Safety and Comp. Div.,* 2005 WY 49, ¶ 11, 109 P.3d 887, 890 (Wyo.2005) quoting *Buggy Bath,* ¶ 16, 18 P.3d at 1187. We give effect to every word, clause and sentence in the statute and construe them *in pari materia. Id.*

### 1. *Wyo. Stat. Ann. § 33-3-121(a)(ii).*

[¶ 28] In its July 9, 2002, complaint against Mr. Dorr, the committee alleged Mr. Dorr was dishonest in the practice of public accounting, in violation of § 33–3–121(a)(ii). That statutory provision stated:

> (a) After notice and hearing, the board may revoke, or may suspend for a period not to exceed two (2) years, any certificate issued under this act or may revoke, suspend, or refuse to renew any permit issued under this act or may censure the holder of a permit for any of the following causes:
>
> * * *
>
> (ii) Dishonesty, fraud or gross negligence in the practice of public accounting;

*Id.* The Board concluded Mr. Dorr violated § 33–3–121(a)(ii):

> 21. The Board further concludes that the actions of engaging in and performing audit practice by Mr. Dorr and the CPA Network, while a violation of the Settlement Agreement and/or the Board's Order Accepting Settlement Agreement, is also a violation of Wyo. Stat. § 33–3–121(a)(ii), dishonesty in the practice of accounting. Mr. Dorr and the CPA Network were dishonest in performing, engaging in, conducting and entering audit practice, related to the June 30, 2000 and/or June 30, 2001, Sixth Judicial District Child Support Authority audits, without informing the Board or seeking prior approval therefor.
>
> 22. The Board further concludes that the actions of engaging in and performing audit practice by Mr. Dorr and the CPA Network, is also a violation of Wyo. Stat. § 33–3–121(a)(ii). Mr. Dorr and the CPA Network were dishonest in performing, engaging in, conducting and entering audit practice, related to the June 30, 2000, Sixth Judicial District Child Support Authority audit, without informing the CSA that such practice was prohibited by the Board.

[¶ 29] Mr. Dorr argues the Board erred by ruling he was dishonest when he participated in the 2000 CSA audit without informing CSA he was prohibited from performing audits. He claims we held in *Dorr I* he was not required to inform a potential client about his license restriction and, in any event, the record clearly shows CSA was aware of his licensing problems. He relies

on the following excerpt from *Dorr I* to support his position that he was not required to inform CSA about his license restriction:

> The Board concluded that Dorr's failure to inform the Beef Council of the restriction placed on his ability to conduct audits by the Settlement Agreement amounted to dishonesty in the practice of public accounting. The Board's finding is insufficient to constitute clear and convincing evidence of dishonesty. Pursuant to the Settlement Agreement, Dorr was prohibited from conducting audits. That prohibition was not, however, absolute: the Settlement Agreement provided for Dorr's reentry to audit practice dependent on his compliance with the terms imposed under the Agreement. The Beef Council contacted Dorr about performing an audit, and Dorr immediately filed a request with the Board to conduct the audit and to initiate the pre-issuance review required by the Settlement Agreement. This is exactly what the Settlement Agreement required Dorr to do. Nowhere in that Agreement is there a requirement that Dorr inform the prospective audit client that his license was restricted. There is nothing in the record to indicate that Dorr owed some duty to disclose his license status to the Beef Council. Perhaps he should have, but the Board has not directed us to any statute, rule, or accounting practice that required him to do so under the circumstances of this case. Without reference to some standard, a practitioner would have no notice that their conduct is prohibited. Since Dorr complied with the letter of the Settlement Agreement, we conclude that the Board has failed to prove by clear and convincing evidence that Dorr committed dishonesty in the practice of public accounting.

*Dorr I*, ¶ 17, 21 P.3d at 744 (footnote omitted). Mr. Dorr claims "[t]he Board is engaging in exactly the same behavior in the present action that this Court found unlawful in the 2001 *Dorr* decision."

[¶ 30] An important distinction exists between Mr. Dorr's actions in *Dorr I* and his actions in the 2000 CSA audit. In *Dorr I*, he did not inform the Wyoming Beef Council his license was restricted; however, once he was contacted by the potential client to perform an audit, he immediately initiated the process to gain the Board's approval. *Dorr I*, ¶ 17, 21 P.3d at 744. In this case, Mr. Dorr affirmatively involved himself and his solely-owned firm in an audit after the Board had expressly denied his request for permission to perform audits.

[¶ 31] Mr. Dorr also claims, even though he was not required to inform CSA about his audit restriction, the CSA board was aware of his licensing issues. He argues "as early as the end of 1999" he notified the CSA board of why Mr. Oberhelman "had to be involved in the audit, and that if the Board would not permit [Mr. Dorr] to re-enter audit practice at that time, Mr. Oberhelman would complete and sign the audit for CSA." Mr. Dorr refers to testimony and evidence about his assignment of the 1999 audit to Mr. Oberhelman for completion as establishing the CSA board was aware of the restriction on his ability to conduct audits. Mr. Dorr testified he had an "on-going" conversation with CSA about his difficulties with the Board.

[¶ 32] While he claimed CSA was aware he was not permitted to perform audits and Julie Pierce did the work for CPA Network on the 2000 CSA audit, CSA's executive director recalled Mr. Dorr working on the audit and she considered him to be CSA's auditor in 2000. This evidence is consistent with the Board's finding Mr. Dorr did not inform CSA of his audit restriction in general or specifically about the Board's denial of his request to reenter audit practice in 2000.

[¶ 33] As the fact finder, the Board was charged with resolving issues of witness credibility and weighing the evidence. *See KG Constr., Inc. v. Sherman,* 2005 WY 116, ¶ 23, 120 P.3d 145, 150 (Wyo. 2005). We have "repeatedly declared a lack of willingness to substitute [our] opinion as to the weight or credibility of the evidence for that of the administrative agency which acted as the trier of fact." *Story v. Wyo. State Bd. of Med. Examiners,* 721 P.2d 1013, 1016–17 (Wyo.1986) (citation omitted). This is true even in professional license cases where the complaining authority has the burden of proving its contentions by clear and convinc-

ing evidence. As we stated in *Story,* where the State Board of Medical Examiners revoked the appellant's license to practice medicine in Wyoming, "[w]e will not displace an agency's findings between two fairly conflicting points of view, even though the court might have made a different decision had the matter been before the court initially." *Id.* at 1017. So long as there is substantial evidence to support the agency's conclusion that the allegations were proven by clear and convincing evidence and the decision is not arbitrary, capricious and is otherwise in accordance with the law, we will not overturn the agency's decision. *Id.* As outlined above, although there is conflicting evidence in the record on this issue, we conclude substantial evidence supports the Board's finding Mr. Dorr withheld information about his license status from CSA when he engaged and participated in the 2000 audit.

[¶ 34] Moreover, even if we were to accept Mr. Dorr's argument about informing CSA about his licensing issues, we could not automatically conclude the Board was incorrect in concluding Mr. Dorr was "dishonest" in the practice of public accounting. In Paragraph 21 of its Conclusions of Law, the Board stated Mr. Dorr and CPA Network violated § 33–3–121(a)(ii) because he was "dishonest in performing, engaging in, conducting and entering audit practice . . . without informing the Board or seeking prior approval therefor." Violation of the settlement agreement, alone, probably does not amount to dishonesty in the practice of public accounting. However, more was at play here than a mere violation of the settlement agreement. While Mr. Dorr attempted to legitimize his activity by involving Ms. Pierce and Mr. Oberhelman in the process, Ms. Pierce testified it was her understanding that CPA Network's association with Mr. Oberhelman was "a way to get around the agreement" with the Board.

[¶ 35] The record supports the Board's conclusion that, unlike in the Beef Council situation, Mr. Dorr did not follow the appropriate procedure to gain Board approval before he performed work on the 2000 CSA audit and he expressly ignored the Board's denial of his request to reenter audit practice. Although Mr. Dorr presented evidence to the contrary, the record contains the "kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 839 (Wyo.1980). *See also, Billings,* ¶ 9, 88 P.3d at 462–63. Thus, the record supports the Board's conclusion that Mr. Dorr violated § 33–3–121(a)(ii) by engaging in "dishonesty . . . in the practice of public accounting."

### 2. *Wyo. Stat. Ann. § 33–3–121(a)(iv)?*

[¶ 36] The committee alleged Mr. Dorr violated § 33–3–121(a)(iv), which states:

> (a) After notice and hearing, the board may revoke, or may suspend for a period not to exceed two (2) years, any certificate issued under this act or may revoke, suspend, or refuse to renew any permit issued under this act or may censure the holder of a permit for any of the following causes:
> \* \* \*
>
> (iv) Violation of a rule of professional conduct promulgated by the board under the authority granted by this act;

The Board's conclusions on this allegation were:

> 23. The Board further concludes that the actions of engaging in and performing audit practice by Mr. Dorr and the CPA Network, is also a violation of Wyo. Stat. § 33–3–121(a)(iv). Mr. Dorr and the CPA Network have violated Board Rule Chapter 6, Section 5(a), by performing, engaging in, conducting and entering audit practice, related to the June 30, 2000 and/or June 30, 2001, Sixth Judicial District Child Support Authority audits, without authority to do so, without informing the Board or CSA of such actions and/or by violating Settlement Agreement and/or the Board's Order Accepting Settlement Agreement. Those acts either separately or collectively adversely reflect upon Mr. Dorr's and the CPA Network's fitness to engage in public accounting.

The Board's decision quotes the relevant part of Chapter 6, Section 5(a) of its Rules as follows:

Rule 401—Discreditable Acts. A holder shall not commit any act that reflects adversely on his fitness to engage in the practice of public accounting.

[¶ 37] Mr. Dorr's sole basis for contesting the Board's conclusion he committed acts which reflect adversely on his fitness to practice public accounting is he complied with "the letter of the" 1999 settlement agreement. We have already concluded he violated the terms of the settlement agreement. Thus, we can summarily reject this argument.

## C. *Were Mr. Dorr's Due Process Rights Violated?*

[¶ 38] Mr. Dorr claims he was denied a fair hearing and his due process rights were violated because: a) the Board and the committee's investigator were biased; and b) the committee "withheld thousands of documents" until the hearing officer ordered them to be produced and the hearing officer refused Mr. Dorr's request to admit additional documents into evidence in the contested case proceeding.

[¶ 39] We consider first Mr. Dorr's claim that his due process rights were violated because the Board was biased. He argues two of the Board members had formed unfavorable opinions of him when they participated as decision makers in his former disciplinary hearing and one Board member was biased because, while acting as Board Chairman, he appointed James Hearne to investigate the allegations against Mr. Dorr and to act as Board representative on the settlement agreement. He also claims Investigator Hearne was potentially biased and had a conflict of interest because he was a competitor of Mr. Dorr's and stood to gain if Mr. Dorr was prohibited from engaging in audit practice in Wyoming.

[¶ 40] Mr. Dorr relies upon our decisions in *Devous v. Wyo. State Bd. of Med. Examiners*, 845 P.2d 408, 417 (Wyo.1993) and *Ririe v. Bd. of Trustees of School Dist. No. One, Crook County, Wyoming*, 674 P.2d 214 (Wyo. 1983) as support for his argument. We held Dr. Devous' right to a fair and impartial hearing was violated when a biased physician sat on the panel deciding his case. *Devous*, 845 P.2d at 417–18. We concluded the other physician was biased because he and Dr. Devous had both practiced medicine in Sweetwater County in the 1980s and the other physician had appeared before the Board on a prior occasion and expressed his opinion that Dr. Devous was guilty of a felony. *Id.* at 418. We concluded, under the circumstances of that case, the other physician's assertion he could objectively weigh the evidence was insufficient to eliminate the potential for bias. *Id.*

[¶ 41] This Court explained the concept of bias among members of the tribunal in agency actions, as follows:

We said in *Fallon*, 441 P.2d at 329, "we also start, of course, with the presumption that members of the board 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" We summarized our perception of our responsibility with respect to the contention of bias and prejudice on the part of the board members when we quoted the following language:

The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a "hearing." This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. There is perhaps no more important right to which litigants are entitled than that they be given such a trial. Its impairment, ipso facto, brings the court, and administrative bodies as well, into public disrepute, and destroys the esteem and confidence which they have enjoyed so generally. Time and experience have demonstrated that the public, as well as litigants, will tolerate the honest mistakes of those who pass judgment, but not the biased acts of those who would deprive litigants of a fair and impartial trial. Foremost among the responsibilities imposed upon a reviewing court, is to make sure that this foundation of our judicial system be not undermined.

*Fallon,* 441 P.2d 322, 329 (citing *Inland Steel Co. v. Nat'l Labor Relations Bd.,* 109 F.2d 9, 20 (7th Cir.1940)).

*Devous,* 845 P.2d at 417. *See also, Painter v. Abels,* 998 P.2d 931, 938 (Wyo.2000) (holding "[d]ue process requires that an agency provide a fair trial without the appearance of bias or prejudice").

[¶ 42] In *Ririe,* we discussed the statutory and constitutional safeguards which ensure a party receives a fair hearing before an impartial tribunal. Mr. Ririe claimed his due process rights were violated because the same school board members, who had voted to accept the superintendent's recommendation his contract be terminated, also sat as the decision makers at the contested case hearing. We said:

> Pursuant to statutory and constitutional mandates such [contested case] hearings are to be conducted in a fair and impartial manner. Section 16–3–112(a) of the Wyoming Administrative Procedure Act specifies in part:
>
> " * * * * * The functions of all those presiding in contested cases shall be conducted in an impartial manner."
>
> Constitutional concepts of due process which require a fair hearing before an impartial tribunal have been held to apply to administrative agencies which adjudicate as well as to courts. *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973); *Fallon v. Wyoming State Board of Medical Examiners, Wyo.,* 441 P.2d 322, 327 (1968).

*Ririe,* 674 P.2d at 220–21. We continued the analysis by quoting the United States Supreme Court:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication * * * * must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guaran-

tee of due process is to be adequately implemented. 421 U.S. at 47, 95 S.Ct. at 1464.

> * * * The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing. Without a showing to the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). 421 U.S. at 55, 95 S.Ct. at 1468.

*Ririe,* 674 P.2d at 221 (quoting *Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). We noted the Supreme Court's discussion of analogous situations:

> "It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law. We should also remember that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around. See *[F.T.C. v.] Cement Institute,* 333 U.S. [683] at 702–703, 68 S.Ct. [793] at 804 [92 L.Ed. 1010; *N.L.R.B. v.] Donnelly Garment Co.,* 330 U.S. [219] at 236–237, 67 S.Ct. [756] at 765 [91 L.Ed. 854]."

*Ririe,* 674 P.2d at 222, quoting *Withrow,* 421 U.S. at 56–57, 95 S.Ct. 1456.

[¶ 43] The *Devous* and *Ririe* decisions do not support Mr. Dorr's position in this case. *Devous* is distinguishable because the disputed board member had actually appeared before the board in a prior proceeding and expressed a decidedly negative opinion about Dr. Devous. Here, two of the Board members had simply considered an earlier alleged violation. This case is, therefore, more like the situations discussed in

*Ririe.* The fact a decision maker participated in an earlier action involving the same circumstances does not automatically disqualify him from acting in a subsequent adjudicatory action. *Ririe,* 674 P.2d at 221–22. Instead, the decision maker is presumed to act with honesty and integrity and the adverse party must demonstrate otherwise to mandate disqualification. Moreover, under the rationale of *Devous, Ririe* and *Withrow,* the fact one of the Board members had appointed Mr. Hearne to investigate allegations against Mr. Dorr would not, automatically, disqualify him from sitting on the adjudicatory body. Mr. Dorr implies the Board members were biased against him and investigative and adjudicatory functions of the Board were improperly combined in this case, but he does not identify any specific evidence to overcome the presumption the Board members acted with honesty and integrity in making their decision.

[¶ 44] Mr. Dorr had the opportunity to elicit specific facts about potential biases and conflicts of interest when he questioned the Board and the hearing examiner in *voir dire.*[7] He apparently did not uncover anything of concern to him because, after questioning the Board members and the hearing examiner, Mr. Dorr's attorney stated:

MR. GODDARD [Mr. Dorr's attorney]: All right. Well I asked you [hearing examiner] to recuse yourself. You refused. You're here. And so if you're telling me you'll be fair, that's all I can ask.

HEARING OFFICER HIBBLER: Okay. Anything further? Any further questions?

MR. GODDARD: No.

HEARING OFFICER HIBBLER: Mr. Weaver [Committee's attorney], any further questions?

MR. WEAVER: No, Your Honor. I'm assuming he passed the Board?

MR. GODDARD: Right.

MR. WEAVER: And the hearing officer?

MR. GODDARD: Right.

[¶ 45] In *Ririe,* we commended the hearing examiner for allowing the attorneys to *voir dire* the school board to investigate concerns about bias and prejudice. *Ririe,* 674 P.2d at 223. We recognized the *voir dire* process as being a "valuable means of discovering individual prejudices—perhaps hidden to all, including the holder—and of emphasizing to the board the importance of conducting a fair and impartial hearing." *Id.* In this case, Mr. Dorr's attorney passed the Board for cause after conducting *voir dire.* In criminal cases where the stakes are arguably higher, we have said, "[g]enerally, when a defendant passes a jury panel for cause, he waives his claim to reversible error." *Robinson v. State,* 11 P.3d 361, 372 (Wyo.2000) (citation omitted). The same rationale applies here. By passing the Board for cause, Mr. Dorr waived any claim his hearing was not fair because the Board members were biased. Moreover, there is no evidence in the record to overcome the presumption the Board members were impartial.

[¶ 46] With regard to Mr. Dorr's claim Investigator Hearne was "potentially biased and had a conflict of interest," we again note this situation is different than *Devous.* In that case, one of the decision makers was a competitor of the doctor's. Here, one of the committee's witnesses was a competitor of Mr. Dorr's. Mr. Hearne testified at the hearing and was cross-examined by Mr. Dorr's attorney. Mr. Hearne was specifically questioned about being Mr. Dorr's competitor. The Board was, therefore, aware of those circumstances and could take them into account in making its determinations about Mr. Hearne's credibility. *See generally, Voss v. Albany County Comm'rs,* 2003 WY 94, ¶ 19, 74 P.3d 714, 720 (Wyo.2003) (indicating opportunity to cross-examine witnesses helped ensure due process rights were protected in administrative action); *Nelson v. Sheridan Manor,* 939 P.2d 252, 256 (Wyo.1997) (indicating opportunity to cross examine witness at the contested case hearing helped protect claimant's due process rights even though witness's deposition testimony, which was not in the case file, was considered by hearing examiner). The record does not support Mr. Dorr's claim he

---

7. Mr. Dorr does not specifically argue on appeal that the hearing examiner was biased or partial.

was denied a fair hearing because the Board and/or the committee's investigator were biased against him.

[¶ 47] We turn, next, to Mr. Dorr's claim his due process rights were violated "when [the committee] withheld thousands of documents until Hearing Examiner Hibbler ordered it to produce those documents to [him], and subsequently was denied a fair hearing when only 1 of [his] additionally proposed 112 exhibits was accepted as evidence in the contested case hearing." Before the contested case hearing, Mr. Dorr served his request for production of documents upon the committee. The relevant portion of the request sought production of: "[t]he investigative report and any and all associated documents regarding Mark A. Dorr." In response to Mr. Dorr's request for production of documents, the committee provided materials from its investigative file to Mr. Dorr prior to the November hearing.

[¶ 48] It became apparent during the hearing there were documents in the committee's possession which were not provided to Mr. Dorr in discovery. Consequently, the hearing examiner ordered the committee to produce all non-privileged information to Mr. Dorr after the hearing and ruled the evidence would remain open. The hearing officer reviewed in-camera all of the documents the committee claimed were privileged and ordered the committee to produce some of those documents to Mr. Dorr.

[¶ 49] On June 9, 2004, Mr. Dorr filed a supplemental disclosure statement, requesting permission to present a significant amount of additional evidence to the Board, including additional exhibits and testimony.[8] The hearing examiner held a hearing on Mr. Dorr's request and the committee's response. In his order, the hearing examiner stated Mr. Dorr had requested admission of 112 additional exhibits into evidence and to be allowed to present an additional two weeks of testimony. The hearing examiner admitted one of the proposed exhibits but refused other offered exhibits because they were irrelevant, immaterial, and/or unduly repetitive. The hearing officer also denied admission of some of the proposed exhibits because they were available to Mr. Dorr prior to the hearing and his request was, therefore, untimely. Further, the hearing examiner denied Mr. Dorr's request to present additional witness testimony:

Mr. Dorr proposes to present an additional two weeks of unspecific testimony elicited from several witnesses, all who have already provided extensive testimony both on direct and cross-examination or were originally identified by Mr. Dorr, but not called. Based upon the denial of all but one additional proposed exhibit, there is no need for further testimony in this matter....

[¶ 50] The hearing officer then closed the evidentiary record and directed the parties to submit written proposed findings of fact, conclusions of law and orders by November 5, 2004. The committee submitted its proposed findings of fact and conclusions of law. Mr. Dorr, apparently, did not comply with the hearing officer's order but, instead, filed motions in the district court to compel exhibits and witnesses, renew his complaint for declaratory relief and stay the proceeding before the Board. Prior to the district court's rulings on Mr. Dorr's motions, the Board entered its decision suspending Mr. Dorr's certificate and permits to practice.

[¶ 51] Mr. Dorr claims his due process rights were violated by the committee's failure to produce all of the documents prior to the hearing. He ignores, however, the hearing examiner's efforts to resolve the discovery dispute. The hearing examiner attempted to cure any prejudice to Mr. Dorr by directing the committee to disclose all non-privileged information pertaining to him and leaving the evidentiary record open. As we have stated in the criminal context, a defendant generally is not denied a fair trial as a result of the prosecution's discovery violations when the district court takes remedial actions to cure the violation. *See e.g., Lindsey v. State,* 725 P.2d 649, 655–656 (Wyo.1986). Mr. Dorr does not explain how the hearing examiner's efforts failed to cure

---

8. Mr. Dorr also filed a motion to dismiss on that same day, claiming he had been denied a fair hearing. The Board denied Mr. Dorr's motion to dismiss.

any prejudice he suffered as a result of the committee's failure to produce the documents in the first place. Consequently, we do not find any constitutional violations as a result of the committee's discovery failures.

[¶ 52] Mr. Dorr also asserts the hearing examiner violated his due process rights by refusing to allow admission of 111 of his 112 proposed additional exhibits. The hearing examiner relied upon § 16-3-108(a), in refusing many of the additional exhibits. That statute states, in pertinent part:

> In contested cases irrelevant, immaterial or unduly repetitious evidence shall be excluded and no sanction shall be imposed or order issued except upon consideration of the whole record or such portion thereof as may be cited by any party and unless supported by the type of evidence commonly relied upon by reasonably prudent men in the conduct of their serious affairs.

Section 16-3-108(a). In accordance with the statutory language, the hearing examiner denied admission of many of the exhibits because they were irrelevant, immaterial or unduly repetitious. *Id. See also, Story,* 721 P.2d at 1019. Mr. Dorr does not explain on appeal how the hearing officer's rulings pursuant to § 16-3-108(a) were incorrect. The hearing officer also denied admission of some of Mr. Dorr's proposed exhibits because he had access to the documents before the hearing, and his request for admission, therefore, was untimely. Again, he does not explain how the hearing examiner erred in reaching that conclusion. We refuse to consider arguments or complaints of error which are not supported by cogent argument and citation to pertinent authority. *Holloway v. Wyo. Game and Fish Comm'n,* 2005 WY 144, ¶ 16, 122 P.3d 959, 963 (Wyo.2005).

[¶ 53] We feel compelled to comment on Mr. Dorr's general contention that he did not receive a fair hearing because of the discovery issues. As we outlined in detail above, the hearing examiner ordered the committee to provide Mr. Dorr with full disclosure of all non-privileged documents in its possession, reviewed all of the documents the committee claimed were privileged, and ordered production of some of those documents. In addition, he delayed the final decision in this case for several months in order to give Mr. Dorr a full opportunity to review all of the documents and present his argument for admission of additional exhibits. The hearing officer took great pains to ensure Mr. Dorr received a fair hearing, and we are not directed to any evidence or authority that suggests otherwise.

**D.** ***Was the Pre-issuance Review Process Contained in the Settlement Agreement Appropriate and Was it Followed?***

[¶ 54] Mr. Dorr presents a couple of different arguments pertaining to the pre-issuance review process. He argues Mr. Oberhelman performed a pre-issuance review in 1999, and the Board should have accepted it. He also claims he was denied due process because the settlement agreement did not define the term "pre-issuance" review.

[¶ 55] The Board's decision did not rely upon any findings about whether or not the pre-issuance review process had been followed. Instead, the Board addressed the pre-issuance review issue by simply stating:

> 5. There was extensive evidence presented in this matter concerning the definition and scope of "pre-issuance" review, as set forth in Provision 13 of the Settlement Agreement. However, that is not an issue that requires determination in this matter. The definitive issue presented is whether or not Mr. Dorr and CPA Network violated the Settlement Agreement by reentering the audit practice without first petitioning the Board and failing to obtain its prior approval to do so. Specifically, did Mr. Dorr and CPA Network perform, engage in, conduct, enter or provide audit practice, related to either or both the June 30, 2000 and/or June 30, 2001, Sixth Judicial District Child Support Authority audits?

[¶ 56] As we explained above, Paragraph 13 of the settlement agreement required Mr. Dorr to petition the Board for approval before he reentered audit practice. The pre-issuance review process came into play only after he obtained the Board's approval to reenter audit practice. The Board's decision focused on Mr. Dorr's failure to obtain the

Board's approval prior to reentering audit practice. Thus, we agree with the Board's reasoning that Mr. Dorr's concerns about the pre-issuance process do not require determination in this case.

[¶ 57] Furthermore, we reject Mr. Dorr's claim the settlement agreement denied his right to due process because the term "pre-issuance review" was ambiguous. Mr. Dorr entered into the settlement agreement voluntarily and with the advice of legal counsel. He agreed to the terms of the agreement in " 'settlement of a bona fide dispute.' " *Mueller,* ¶ 18, 124 P.3d at 350–51, quoting *Parsley v. Wyo. Auto. Co.,* 395 P.2d 291, 295 (Wyo.1964). A settlement or compromise is " 'an agreement between two or more persons who, to avoid a lawsuit, amicably settle their differences on **such terms as they can agree on.'** " *Id.,* quoting *Peters Grazing Ass'n v. Legerski,* 544 P.2d 449, 456 n. 3 (Wyo.1975) which quoted 15A C.J.S. *Compromise and Settlement* § 1 at 170 (emphasis added). His claim, at this late date, that the settlement agreement's terms violate his due process rights is unpersuasive.

## CONCLUSION

[¶ 58] In accordance with our standard of review, we have reviewed thousands of pages of transcript and documents from the contested case proceeding. We conclude there is substantial evidence in the record to support the Board's conclusions that the committee proved, by clear and convincing evidence, Mr. Dorr violated the terms of the settlement agreement when he failed to obtain Board approval prior to re-entering audit practice and violated the Wyoming Certified Public Accountants Act. Furthermore, after reviewing the entire record, including the conflicting evidence, we hold the Board "could have reasonably made its findings and order upon all of the evidence before it." *Billings,* ¶ 8, 88 P.3d at 462. Therefore, the Board's decision was not arbitrary or capricious. Finally, we conclude Mr. Dorr's due process rights were not violated by the procedures employed by the Board and hearing officer at his licensing hearing.

[¶ 59] Affirmed.